James H. McLELLAN,
Plaintiff-Appellant,

v.

MISSISSIPPI POWER & LIGHT COM-
PANY, International Brotherhood of
Electrical Workers, Local 605 Electri-
cal Workers, Defendants-Appellees.

No. 73–3226.

United States Court of Appeals,
Fifth Circuit.

Feb. 5, 1976.
Rehearing En Banc Granted
April 21, 1976.

W. B. Duggins, Jr., Vicksburg, Miss., Dixon L. Pyles, Jackson, Miss., for plaintiff-appellant.

Sherwood W. Wise, E. Grady Jolly, Jackson, Miss., for defendants-appellees.

Before BROWN, Chief Judge, GODBOLD and RONEY, Circuit Judges.

GODBOLD, Circuit Judge:

Plaintiff-appellant, an employee of Mississippi Power and Light Company (MPL) was discharged on the ground that he violated company policy by filing a voluntary petition in bankruptcy. He sued MPL seeking reinstatement and damages, alleging that the company's action violated a federally protected right. MPL timely filed a motion to dismiss. Prior to the court's acting on the motion, the plaintiff without leave of court filed an amended complaint seeking, pursuant to Rule 15, F.R.Civ.P., to add two new parties, the International Brotherhood of Electrical Workers and the local of that union. The amended complaint added several new jurisdictional bases, including 42 U.S.C. §§ 1981, 1983, 1985(3) and 1988, 29 U.S.C. § 185, and a state ground as well. It charged that the union was hostile toward plaintiff and failed to fairly represent him in grievance procedures, that the union and MPL conspired to deny his rights under the collective bargaining contract, and that MPL acted under color of state law. Although the amended complaint is inartfully drawn, our view, discussed below, is that it sufficiently alleges class-based discrimination resulting from the conspiracy between the defendants and directed against the class of MPL employees who seek to file in bankruptcy.

The District Court recognized plaintiff's right to amend as against MPL and dismissed the amended complaint for failure to state a claim against that defendant on the ground that no state action was involved. As to the unions, the court held that they were additional parties that could be added only pursuant to

Rule 21, F.R.Civ.P., which requires leave of court, and, leave not having been obtained, the amended complaint was dismissed with respect to the unions.

## I. MPL AND § 1983.

■ The District Court correctly held that the amended complaint did not state a cause of action against MPL under § 1983. A private corporate utility company is not brought within the purview of state action merely because it is state regulated. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Martin v. Pacific Northwest Bell Telephone Co.,* 441 F.2d 1116 (C.A.9), *cert. denied,* 404 U.S. 873, 92 S.Ct. 89, 30 L.Ed.2d 117 (1971). See also *Particular Cleaners, Inc. v. Commonwealth Edison Co.,* 457 F.2d 189 (C.A.7, 1972), and *Kadlec v. Illinois Bell Telephone Co.,* 407 F.2d 624 (C.A.7), *cert. denied,* 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95 (1969). The Supreme Court in *Jackson* examined the state action question with respect to a utility company and stated:

> The inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

419 U.S. at 351, 95 S.Ct. at 453, 42 L.Ed.2d at 484. We see no close nexus between the state and the discharge of McLellan from his employment with MPL. Absent state action, there is no cause of action under § 1983.[1]

## II. THE UNION DEFENDANTS AND RULES 15 AND 21.

The District Court dismissed the amended complaint adding the international and local unions as defendants, on the ground that leave of court to file the amendment was required under Rule 21 and had not been obtained.

Under the first sentence of Rule 15(a), "at any time before a responsive pleading is served" a party may "amend his pleading once as a matter of course." Under the second sentence, in other situations a party can amend only by consent of the other party or by leave of court, "and leave shall be freely given when justice so requires."

Rule 21, headed "Misjoinder and Non-Joinder of Parties," provides that "[p]arties may be dropped or added by order of the court on motion of any party or of its own initiative at any state of the action and on such terms as are just."

■■ Which rule takes precedence if a party attempts to drop or add parties by an amended pleading filed before a responsive pleading is served?[2] May the amending party file his amendment as a matter of course (first sentence of Rule 15) or must he obtain leave (Rule 21)? The district court cases are divided.[3]

1. *See* footnote 7, *infra.*

2. A motion to dismiss is not a responsive pleading for purposes of Rule 15(a). 4 Wright & Miller, Federal Practice & Procedure, § 1475 at 387, § 1482 at 409, § 1483; 3 Moore, Federal Practice, § 15.07[2] at 851.

3. Leave not required: *Bransted v. Schmidt,* 324 F.Supp. 1232 (W.D.Wis., 1971); *Jones v. Electrodyne Co.,* 224 F.Supp. 599 (W.D.Mo., 1963); *U. S. v. Sinclair,* 347 F.Supp. 1129 (D.Del., 1972) (court "inclined" to think leave not required but granted it anyhow). *See also,* holding that although leave is required, the court, in acting on a Rule 21 motion, is governed by the liberal amendment standards of Rule 15(a): *Kaminsky v. Abrams,* 41 F.R.D. 168 (S.D.N.Y., 1966); *Gibbs v. Titelman,* 369 F.Supp. 38, 53 n. 25 (E.D.Pa., 1973); *Fair Housing Development Fund Corp. v. Burke,* 55 F.R.D. 414 (E.D.N.Y., 1972).

Leave required: *Gordon v. Lipoff,* 320 F.Supp. 905 (W.D.Mo., 1970); *International*

*Bhd. of Teamsters v. AFL–CIO,* 32 F.R.D. 441 (E.D.Mich., 1963); *Rekeweg v. Federal Mut. Ins. Co.,* 27 F.R.D. 431 (N.D.Ind., 1961) (Rule 21 prevails but new plaintiff joined by court on its own initiative); *National Maritime Union v. Curran,* 87 F.Supp. 423 (S.D.N.Y., 1949); *Mitchell v. Carborundum Co.,* 7 F.R.D. 523 (W.D.N.Y., 1947); *Joseph v. House,* 353 F.Supp. 367 (E.D.Va., 1973) (court refused to permit amendment as a matter of right under Rule 15 although no responsive pleading had been filed but permitted it as a matter of discretion under Rule 21); *Spencer v. Dixon,* 290 F.Supp. 531 (W.D.La., 1968); *Zarate v. State Dept. of Health and Rehabilitative Services,* 347 F.Supp. 1004 (S.D.Fla., 1971, three-judge court), *aff'd,* 407 U.S. 918, 92 S.Ct. 2462, 32 L.Ed.2d 803 (1972). *See also Henry v. First National Bank of Clarksdale,* 50 F.R.D. 251, 260 n. 5 (N.D.Miss., 1970), *vacated* 444 F.2d 1300 (C.A.5, 1971) and *Holtzman v. Richardson,* 361 F.Supp. 544 (E.D.N.Y., 1973), *rev'd,* 484 F.2d 1307 (C.A.2, 1973) (on appeal both

The question has not been squarely decided at the circuit level. The District Court in this case gave precedence to Rule 21. We reach the opposite conclusion.

The usual rationale for applying Rule 21, where any rationale is stated, has been that if there is conflict or ambiguity between Rules 15 and 21 the latter, as the more specific rule, must control. Professor Wright recommends giving preference to Rule 15(a), 6 Wright & Miller, Federal Practice and Procedure, § 1479 at 401–402. He points out that the general-versus-specific explanation is an unsatisfactory one. Arguably Rule 15 is the more specific rule, since it sets forth a particular means by which a party attempts to add or drop parties—by amendment to his pleadings—as opposed to Rule 21's more general treatment of the overall subject matter of dropping and adding parties. *Id.* at 401.

Moore recognizes the existence of the several district court opinions choosing Rule 21 but refers to them as "too restrictive of the specific intent of Rule 15(a)." 3A Moore, Federal Practice, § 21.02 at 21–3 n. 2; 3 Moore, Federal Practice, § 15.07[2] at 858.

The conclusion which we reach is presaged by *Hines v. Delta Airlines,* 461 F.2d 576 (C.A.5, 1972). There, in passing on an amendment adding Florida Airlines as a party, we did not turn to Rule 21 but to Rule 15 and relied upon the provision in the second sentence of Rule 15(a) that "leave shall be freely given when justice so requires." [4]

Our conclusion is in keeping with the overall philosophy of the Rules.

> [Rule 15] re-emphasizes and assists in attaining the objective of the rules on pleadings: that pleadings are not an

end in themselves, but are only a means to the proper presentation of a case; that at all times they are to assist, not deter, the disposition of litigation on the merits.

3 Moore, Federal Practice, § 15.02[1] at 813. See also *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80, 85 (1957).

Professor Wright makes the very practical point that the first part of Rule 15(a) contemplates that the court should not have to be concerned with passing on amendments at an early stage when there is little likelihood of prejudice to other parties. Finally, the cases that require Rule 21 mechanics but apply Rule 15(a) standards, and those in which the court goes through the form of giving precedence to Rule 21 but then acts on its own initiative to permit the amendment,[5] give indirect support to our views.

The result that we reach is not precluded by the fact that prior to the amendment adding the unions as defendants no federal cause of action had been stated. *International Ladies' Garment Workers' Union v. Donnelly Garment Co.,* 121 F.2d 561 (C.A.8, 1941); *Finn v. American Fire & Casualty Co.,* 207 F.2d 113 (C.A.5, 1953), *cert. denied,* 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1069 (1954); *cf. Hackner v. Guaranty Trust Co. of New York,* 117 F.2d 95 (C.A.2), *cert. denied,* 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941); 3 Moore, Federal Practice, § 15.08[2] at 878, § 15.09 at 945.

### III. ALL DEFENDANTS AND § 1985(3).

(a). *Griffin v. Breckenridge.*

The Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), discussed at

cases ordered dismissed for lack of jurisdiction).

**4.** Perhaps there had been no "responsive pleading" served. *See* footnote 2, *supra.* Also, the plaintiff had filed three previous amendments. But, presumably because of the tangled procedural history of the case, the court overleaped these problems and relied

upon the statement in the second sentence of Rule 15(a). That statement accords with the general philosophy of the Rules, discussed *infra.* What is of primary importance about *Hines* is that in the context of an amendment adding a party, the court chose Rule 15 over Rule 21.

**5.** *See* footnote 3, *supra.*

length the meaning of § 1985(3)[6] and the constitutional power on which that Congressional enactment is based. *Griffin* involved a § 1985(3) action by black citizens of Mississippi who alleged that defendants, white citizens of Mississippi, had conspired to stop and to physically assault plaintiffs as they traveled on a public highway. The Court initially addressed a question of statutory construction: does § 1985(3) reach conspiracies by private individuals as opposed to conspiracies where the defendants are clothed in state action?[7] Basing its answer on the literal language of the statute, the interpretation given related civil rights statutes in recent years, the complementary roles of the various civil rights statutes, and the legislative history of § 1985(3), the Court concluded that "all indicators . . . point unwaveringly to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798, 29 L.Ed.2d at 348.

Justice Stewart, writing for the Court, cautioned, however, that not all private conspiracies to interfere with the rights of another fall within § 1985(3). The Congressional purpose was to include only those conspiracies arising from an "invidiously discriminatory motivation":

> The language requiring intent to deprive of *equal* protection, or *equal* privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.

403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. The Court then specifically noted that, since allegations of racial discrimination were involved, it was unnecessary to determine whether conspiracies motivated by a discriminatory animus other than racial bias fall within § 1985(3). 403 U.S. at 102, 91 S.Ct. at 1798, 29 L.Ed.2d at 348 n. 9.

With this interpretation of § 1985(3) established, four elements necessary for plaintiffs to state a cause of action under § 1985(3) were set forth:

(1) the defendants did "conspire or go in disguise on the highway or on the premises of another"

(2) "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."

(3) one or more of the conspirators did or caused to be done, "any act in furtherance of the object of [the] conspiracy" whereby another was

(4) (a) "injured in his person or property" or

(b) "deprived of having and exercising any right or privilege of a citizen of the United States."

403 U.S. at 102–103, 91 S.Ct. at 1798, 29 L.Ed.2d at 348. When these four requirements were applied, it was concluded that the plaintiffs had stated a cause of action under § 1985(3). Specifically, with respect to the second requirement, the Court found allegations which "clearly support the requisite animus to deprive the petitioners of the equal enjoyment of legal rights because of their

**6.** 42 U.S.C. § 1985(3) provides:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

**7.** The language of § 1985(3) makes no reference to state action. Compare the language of 42 U.S.C. § 1983, which imposes liability upon persons "who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," deprive citizens of federal statutory or constitutional rights. *See Hall v. Garson,* 430 F.2d 430, 438–40 (C.A.5, 1970); *Parish v. National Collegiate Athletic Association,* 506 F.2d 1028 (C.A.5, 1975); *Greco v. Orange Memorial Hospital Corp.,* 513 F.2d 873 (C.A.5, 1975).

race." 403 U.S. at 103, 91 S.Ct. at 1799, 29 L.Ed.2d at 349.

With § 1985(3) thus interpreted and applied, the Court then sought to identify "a source of congressional power to reach the private conspiracy alleged by the complaint in this case." The sources it identified were the Thirteenth Amendment and the constitutional right of interstate travel. 403 U.S. at 104–106, 91 S.Ct. at 1799–1800, 29 L.Ed.2d at 349–351. The opinion noted, however, that other provisions of the Constitution (such as § 5 of the Fourteenth Amendment) might authorize Congress to reach other conspiracies by private individuals. 403 U.S. at 107, 91 S.Ct. at 1801, 29 L.Ed.2d at 351. On the facts of the case, however, it was necessary to look only as far as the Thirteenth Amendment and the right to interstate travel.

(b). *Statement of a cause of action under Griffin.*

■ Applying the above principles to the present case, we conclude that plaintiff has stated a cause of action under § 1985(3). Our conclusions concerning the coverage of § 1985(3) and the constitutional powers on which it rests are, of course, based on the allegations made in this case. Further delineation of the limits of the reach of § 1985(3), as a matter of statutory construction and of constitutional limitations on the authority of Congress, must be through case by case development.

There is little difficulty in finding allegations which meet the first, third and fourth elements of a § 1985(3) cause of action as set forth in *Griffin.* As to the first element, plaintiff alleges a conspiracy between the defendant unions and MPL. Plaintiff's allegation that he was discharged by MPL sets forth the requisite "act in furtherance" of the third element. And with respect to the fourth element, he alleges loss of, *inter alia,* wages and benefits, thus establishing the requisite injury.

■ There is not in the present case any allegation of racial animus, which *Griffin* found sufficient to comply with the second element. We are, therefore, brought face to face with the question, specifically left undecided by *Griffin,* whether allegations of nonracial class-based invidiously discriminatory animus are sufficient.

The Sixth Circuit recently addressed this question and concluded that "§ 1985's protection reaches clearly defined classes, such as supporters of a political candidate. If a plaintiff can show that he was denied the protection of the law because of the class of which he was a member, he has an actionable claim under § 1985(3)." *Cameron v. Brock,* 473 F.2d 608, 610 (C.A.6, 1973). That court concluded that a supporter of a candidate for sheriff could maintain a § 1985(3) action against individuals who had interfered with the plaintiff's exercise of federal rights. In this circuit, in *Fallis v. Toastmasters Int'l, Inc.,* 467 F.2d 1389 (C.A.5, 1972), we addressed both racial and nonracial considerations in determining whether a cause of action was stated. The charge was that the defendant organization was discriminating against federal prison inmates and employees in refusing to charter a chapter in a particular federal prison. We held that "[t]he denial of the application for a charter was apparently caused *not by any invidious bias* but rather by some visiting Toastmasters' officials taking umbrage at personal insults incurred when visiting the penitentiary. . . . *Similarly,* racially motivated discrimination is nowhere alleged." *Id.* at 1390 (emphasis added). Our approach was the same in *Jacobson v. Industrial Foundation of Permian Basin,* 456 F.2d 258 (C.A.5, 1972), where plaintiff claimed a conspiracy to deprive him of employment by placing his name on a blacklist because he had made claims under the Texas Workmen's Compensation Act. We noted the fact that plaintiff admitted he was "not a member of a racial minority or group," but, not stopping there, we noted also that plaintiff had not properly alleged the existence of a class. In *Thomas v. Economic Action Comm. of Matagorda Cty., Texas,* 504 F.2d 563 (C.A.5, 1974), we did not reach the issue left open in *Griffin.*

In several cases in other circuits where racial bias was not alleged the court has decided on grounds other than the absence of racial allegations that a *Griffin*-type cause of action was not stated. *Bricker v. Crane,* 468 F.2d 1228 (C.A.1, 1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1368, 35 L.Ed.2d 592 (1973); *O'Neill v. Grayson County War Memorial Hospital,* 472 F.2d 1140 (C.A.6, 1973); *Arnold v. Tiffany,* 487 F.2d 216 (C.A.9, 1973), *cert. denied,* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1974); *Sykes v. State of California (Dept. of Motor Vehicles),* 497 F.2d 197 (C.A.9, 1974); *Ward v. St. Anthony Hospital,* 476 F.2d 671 (C.A.10, 1973). In other cases the court has found the complaint insufficient because neither racial nor nonracial class-based animus was alleged. *Crabtree v. Brennan,* 466 F.2d 480 (C.A.6, 1972); *Denman v. Leedy,* 479 F.2d 1097 (C.A.6, 1973). See also *Hughes v. Ranger Fuel Corp.,* 467 F.2d 6 (C.A.4, 1972) (assuming without deciding that § 1985(3) is not restricted to racial motivation).[8] In no post-*Griffin* case has any circuit found that § 1985(3) is limited to racial situations.

Recognizing § 1985(3)'s coverage of conspiracies motivated by nonracial class animus is consistent with the approach of the Supreme Court "to other Reconstruction civil rights statutes in [recent] years . . . to 'accord [them] a sweep as broad as [their] language.'" *Griffin v. Breckenridge,* 403 U.S. at 97, 91 S.Ct. at 1796, 29 L.Ed.2d at 345. The language of § 1985(3) gives no indication that racial discrimination is a requisite element of a cause of action thereunder. To engraft such a limitation would bring the statute into anomalous contrast with comparable Reconstruction civil rights legislation, under which a wide variety of nonracial classes have won relief from discriminatory treatment.[9] We therefore hold that in order to come within § 1985(3), it is unnecessary for plaintiff to be the subject of racial discrimination.

The amended complaint is not a model of clarity or of precision. However, under the liberal standards mandated by the federal rules,[10] we think that it sufficiently alleges class-based discrimination of such a nature as to fall within § 1985(3). Plaintiff claims that the defendant unions and MPL conspired to deprive him of rights under the collective bargaining contract, and that included in this collusion are MPL's discharging him because of his filing in bankruptcy and the union's refusing to attempt to protect him in the exercise of his federal right to avail himself of bankruptcy. He alleges a company policy of discharging bankrupts, discriminating against the class of MPL employees who seek to file in bankruptcy and re-

---

**8.** In *Azar v. Conley,* 456 F.2d 1382 (C.A.6, 1972), the court reversed the dismissal of a § 1985(3) action brought by a middle class white family. Although the issue had not been raised by the parties, the court said in dicta: "It is not unreasonable . . . to assume that the protection of Section 1985(3) extends not only to blacks and other racial minorities but to *any person* or group that is the object of invidious discrimination." *Id.* at 1387 n. 5.

**9.** Sections 1981 and 1982 make specific reference to race and therefore have not been extended to nonracial discrimination, *see, e. g., Agnew v. City of Compton,* 239 F.2d 226, 230 (C.A.9, 1956), *cert. denied,* 353 U.S. 959, 77 S.Ct. 868, 1 L.Ed.2d 910 (1957); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Section 1983, however, has not been so limited. It protects rights secured by the equal protection clause of the Fourteenth Amendment. *See Hagans v. Lavine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). A number of nonracial classes have therefore employed § 1983 in actions to stop discrimination. *See, e. g., Kelm v. Carlson,* 473 F.2d 1267 (C.A.6, 1973) (students seeking to demonstrate residency); *Morris v. Michigan State Board of Education,* 472 F.2d 1207 (C.A.6, 1973) (sex); *Adams v. City of Park Ridge,* 293 F.2d 585 (C.A.7, 1961) (charities seeking to solicit); *Ury v. Santee,* 303 F.Supp. 119 (W.D. Ill., 1969) (voters assigned to overcrowded polling places).

**10.** "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, supra,* 355 U.S. at 45–46, 78 S.Ct. at 102, 2 L.Ed.2d at 84. *See* Wright, Law of Federal Courts, § 68, pp. 285–86; 5 Wright & Miller, Federal Practice and Procedure, §§ 1215, 1216.

sulting from a conspiracy between the defendants.[11]

█ The adequacy of these allegations is seen by close analysis of the *Griffin* formula: "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." We turn first to the requirement that the asserted discrimination be "class-based." We have already noted the Sixth Circuit's statement that the class must be "clearly defined," *Cameron, supra* ; see *Jacobson, supra*.[12] If the conduct was directed at the plaintiff because of his individual or personal traits rather than because of class membership, the suit must be dismissed, as in *Hughes, Ward* and *O'Neill, supra*.[13] If the plaintiff asserts the existence of the class without providing supporting details, and there is no indication that anyone else ever has been or will be a member of the alleged class, dismissal is likewise warranted. *Bricker, supra.*

█ McLellan's complaint withstands all of these objections. He claims that the defendants' animus was directed at a significant number of persons on the basis of their shared, rather than individual, characteristics. Specifically, he charges that under MPL's rules all employees who file bankruptcy petitions are in violation of company policy and are discharged.[14] The class subjected to discrimination is neither imaginary nor uncertain. It was not contrived for litigation purposes. It has real-world roots.

To say that the plaintiff belongs to a class, however, is not to say that his particular class is one of those protected by § 1985(3). We do not attempt to formulate plenary standards for ascertaining what classes Congress has protected through this legislation but rather address only the problem at hand.[15] We hold that MPL employees

11. Plaintiff's allegations indicate animus motivating both MPL and the unions. We pretermit the question of whether a class-based animus motivating only one conspirator would be sufficient to bring the conspiracy within § 1985(3). If the evidence demonstrates that not all conspirators were motivated by a class-based animus, it will be for the District Court in the first instance to resolve the question of the application of § 1985(3). *Cf. U. S. v. Hoffa,* 367 F.2d 698, 706 (C.A.7, 1966), *vacated on other grounds,* 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 (1967); *U. S. v. Cervantes,* 466 F.2d 736, 738 (C.A.7), *cert. denied,* 409 U.S. 886, 93 S.Ct. 108, 34 L.Ed.2d 143 (1972).

 The amended complaint raises a possibility that plaintiff is attempting to charge animus directed toward a class composed of employees who refuse to join the union. Even with the liberality of *Conley v. Gibson,* this is not sufficiently alleged.

12. In *Jacobson* we dismissed the plaintiff's complaint because he had only "vaguely argue[d]" that he was a member of a class "composed of persons who had filed similar claims for workmen's compensation." We have examined the Appendix and the briefs in that case. Plaintiff alleged a conspiracy between his former employer and the Industrial Foundation of the Permian Basin (a West Texas oil field), for the purpose of denying him employment through the means of a blacklist. The conspiracy was alleged to have been entered into after plaintiff had suffered two industrial accidents while performing oil field work in Texas, had settled his claims under

the Texas Workmen's Compensation Law, and had been discharged. The complaint nowhere referred to a defined class or group which was the basis for animus. The only reference even arguably having that effect was that the conspiracy was to deny plaintiff "the equal right and privilege, with every other Texas citizen, to utilize the Texas Workmen's Compensation Law without fear of discrimination, conspiracy and reprisals by Defendants." (The defendants were the two alleged conspirators and other oil field companies in West Texas who had received the blacklist and with whom plaintiff had unsuccessfully sought employment.) Plaintiff's brief on appeal nowhere attempted to delineate a class, or even referred to the existence of a class, but rather spoke of animus to the *plaintiff* because he had filed workmen's compensation claims.

 We do not read *Jacobson's* reference to the absence of a class action as meaning that the "class-based" animus supporting § 1985(3) liability must be directed at a "class" that can sue or be sued under Rule 23, F.R.Civ.P. It is surely obvious that there is no relationship between these two uses of the same word.

13. *Arnold, supra,* is perhaps best understood as making the related point that dismissal is proper where it appears that the only class in which the plaintiff claims membership was not in fact the object of the defendants' animus.

14. MPL concedes the existence of this policy. Brief of Defendant-Appellee at p. 2.

15. It might be suggested that, since § 1985(3) alludes to "equal protection," the animus must

wishing to file bankruptcy petitions comprise a protected class. Both Congress and the courts have emphasized the importance of assisting financially distressed debtors. The Congressional debates preceding the enactment of the Bankruptcy Act in 1898 reflected this concern:

> An enlightened public policy demands that a debtor loaded down with debts impossible to be discharged, with his productive energies so paralyzed that his business undertakings are conducted without profit to himself or creditors, should be permitted to surrender his estate, and, divested of debt, begin anew the race of life.

31 Cong.Rec. 1885 (1898) (remarks of Congressman Ball of Texas). Similarly Congressman Henderson of Iowa, opening debate on certain amendments to the proposed legislation, commented on the troubles of the financially distressed businessman and concluded:

> Is this a good thing for our country? Is it not better for the creditors to divide among them fairly what these poor fellows have and let them once more hold up their heads among their fellow-men and join their energies to those of the rest of the community for the common welfare?

31 Cong.Rec. 6429 (1898). Similar sentiments are found throughout the debates, indicating a strong Congressional interest in assisting financially troubled individuals who desire to voluntarily obtain the benefits offered under the Bankruptcy Acts.

■ The Supreme Court "on numerous occasions has stated that '[o]ne of the primary purposes of the Bankruptcy Act' is to give debtors 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.'" *Perez v. Campbell*, 402 U.S. 637, 648, 91 S.Ct. 1704, 1710–1711, 29 L.Ed.2d 233, 241 (1971) (citations omitted). The Court has often recognized the "public as well as private interest" in giving to "the honest but unfortunate debtor" the opportunity to start afresh. *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235 (1934). See *Stellwagen v. Clum*, 245 U.S. 605, 617, 38 S.Ct. 215, 218, 62 L.Ed. 507, 512 (1918); *Williams v. United States Fidelity & Guaranty Co.*, 236 U.S. 549, 35 S.Ct. 289, 59 L.Ed. 713 (1915); *Beall v. Pinckney*, 150 F.2d 467, 470 (C.A.5, 1945); *Menier v. U. S.*, 405 F.2d 245, 249 (C.A.5, 1968). The legislative intent to assist economically troubled individuals and the long line of federal cases reaffirming that goal bring us to the conclusion that § 1985(3) protects a class composed of individuals seeking bankruptcy, allegedly the subject of an invidiously discriminatory animus in the present case, from conspiracies to interfere with their exercise of federal rights.

Furthermore, recent statistics indicate that a substantial percentage of the individuals obtaining discharges in bankruptcy have incomes significantly below the national average.[16] Those obtaining dis-

---

consist in hostility toward one of the "suspect classes" enjoying special protection under the Fourteenth Amendment. This view will not survive careful scrutiny. The *Griffin* case itself illustrates that the statute can be applied without any reliance on Fourteenth Amendment concepts. *See also* footnote 20, *infra*. Moreover, blacks, aliens, and other "suspect" groups are by no means the only beneficiaries of equal protection under the Fourteenth Amendment. Any other group can rely on the equal protection clause to challenge state action that is not rationally related to a legitimate state goal. *See, e. g., Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (unmarried persons); *James v.*

*Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972) (indigent judgment debtors). Since the Fourteenth Amendment is not directed exclusively at suspect groups, we decline to hold that it circumscribes the "classes" that might be targets of a conspiracy actionable under § 1985(3).

**16.** The Commission on the Bankruptcy Laws of the United States examined a variety of recent studies and found: "Not surprisingly, the income for most debtors studied was lower than for the general population. Adjusted to 1967 dollars, median annual figures ranged from $4,024 to $6,245, with most figures in the upper $4,000 range or the lower $5,000 range.

charges in bankruptcy are generally individuals in financial distress. The Supreme Court in recent years has offered special protections to individuals subject to discriminatory treatment due to their distressed financial condition. Numerous decisions have attempted to assure that the poor are not subject to discriminatory burdens. See, *e. g., Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956); *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Harper v. Virginia State Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); *Boddie v. Connecticut,* 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Tate v. Short,* 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).[17] See also Note, Discriminations Against the Poor and the Fourteenth Amendment, 81 Harv.L.Rev. 435 (1967). We need not decide in the present case to what extent the impoverished are a class deserving of a high level of protection under the equal protection clause. See *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). We need merely note that to the extent that a class of individuals seeking to file in bankruptcy is a class of impoverished individuals, the above line of cases reinforces our conclusion that § 1985(3) is available to them when they are subject to class-based discrimination.

Our recognition that a protected class is involved does not end the inquiry, because the discriminatory intent must also be "invidious." We interpret the Court's term to suggest a considerable degree of unjustifiability and irrationality. Thus, although the plaintiff has alleged enough to survive a motion to dismiss, on remand he must offer evidence tending to show that the policy of discharging employees who file voluntary bankruptcy petitions is not justifiable in light of the necessities of MPL's business, or that it is irrational. The defendants, in turn, will be entitled to present evidence that the policy serves the interests of its business sufficiently to outweigh the injury inflicted upon the plaintiff.[18]

We therefore conclude that plaintiff's allegations of a conspiracy directed against the protected class consisting of individuals seeking to obtain the shelter of the bankruptcy laws are sufficient to establish the second element of a § 1985(3) cause of action. Having determined that plaintiff has alleged all four elements of a § 1985(3) cause of action, we turn to constitutional issues concerning the source of Congressional power.

(c). *Source of Congressional power in this case.*

 The Supreme Court in *Griffin* concluded that the Thirteenth Amendment and the right of interstate travel authorized Congress to reach the private conspiracy alleged. Neither of those sources of Congressional power identified in *Griffin* is applicable in this case, but Congressional authority to reach the conspiracy alleged springs from article I, § 8 of the Constitution:

> The Congress shall have Power . . .
> To establish . . . uniform Laws

---

The median incomes in 1967 dollars of all families in the general population rose from $5,878 in [calendar year] 1956 to $8,486 in [calendar year] 1970." Report of the Commission on the Bankruptcy Laws of the United States, Part I, 1973, p. 43.

17. *U. S. v. Kras,* 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973) upheld the constitutionality of a requirement of prepayment of a filing fee in order to obtain a discharge in bankruptcy. *Kras* does not run counter to any of plaintiff's contentions in the instant case. The opinion in *Kras* noted the importance of relief offered under the bankruptcy laws and merely concluded that the filing fee requirement did not violate any constitutional rights of an indigent seeking to obtain a discharge in bankruptcy.

18. In a case where the protected class and the infringed right were different it might be clear from the outset that there could be no legal justification for the alleged conduct. As a practical matter the plaintiff would then have no distinct need to prove invidiousness. Showing the intentionally discriminatory acts would suffice. *See Cameron v. Brock, supra,* at 610. But MPL's policy of discharging bankrupts is not obviously impossible to justify.

on the Subject of Bankruptcies throughout the United States ∴ .

Read in conjunction with the necessary and proper clause,[19] the bankruptcy power manifestly vests Congress with the power, via civil remedies, to discourage people from conspiring to interfere with efforts of individuals to obtain discharges in bankruptcy.[20]

The bankruptcy power has consistently been given a broad interpretation by the Supreme Court in passing on the validity of Congressional enactments enacted pursuant to that power:

> From the beginning, the tendency of legislation and of judicial interpretation has been uniformly in the direction of progressive liberalization in respect of the operation of the bankruptcy power.

*Continental Illinois National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co.,* 294 U.S. 648, 668, 55 S.Ct. 595, 603, 79 L.Ed. 1110, 1124 (1935). See also *International Shoe Co. v. Pinkus,* 278 U.S. 261, 49 S.Ct. 108, 73 L.Ed. 318 (1929). For example, recent decisions have relied in part on the bankruptcy power in upholding the validity of federal statutes regulating extortionate credit transactions[21] and regulating the number and effects of garnishments.[22]

This broad reading of the bankruptcy clause is given added support by the authority vested in Congress under the necessary and proper clause. Early in the nation's history the Supreme Court, speaking through Chief Justice Marshall, discussed at length the meaning of the "necessary and proper" clause and concluded that a broad interpretation of it was essential for the effective performance of the responsibilities and powers vested in Congress:

> We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.

*McCulloch v. Maryland,* 4 Wheat. 316, 420, 4 L.Ed. 579 (1819). The Supreme Court sixty years later, in reviewing the

---

**19.** Article I, § 8 also provides:
"The Congress shall have Power . . . To make all laws which shall be necessary and proper for carrying into Execution the foregoing Powers . . ."

**20.** Much controversy has been raised regarding the extent to which the Fourteenth Amendment authorizes Congress to reach private actions. *Compare Dombrowski v. Dowling,* 459 F.2d 190 (C.A.7, 1972), (finding that the Fourteenth Amendment does not authorize Congress to reach purely private action) *with Action v. Gannon,* 450 F.2d 1227 (C.A.8, 1971); *Richardson v. Miller,* 446 F.2d 1247 (C.A.3, 1971) (finding that § 5 of the Fourteenth Amendment enables Congress to reach private action). *See also Bellamy v. Mason's Stores, Inc.,* 508 F.2d 504 (C.A.4, 1974) (finding that § 1985 does not purport to exercise Congress' power under § 5). *See generally,* Feuerstein,

*Civil Rights Crimes and the Federal Power to Punish Private Individuals for Interference With Federally Secured Rights,* 19 Vanderbilt L.Rev. 641 (1966); Comment, *Civil Rights: Are Private Conspiracies Redressable in Federal Courts?,* 24 U.Miami L.Rev. 780 (1971); Comment, *Legislating Civil Rights: The Role of Sections 241 and 242 in the Revised Criminal Code,* 63 Ga.L.J. 203 (1974). We find it unnecessary to enter into this controversy.

**21.** *See U. S. v. Fiore,* 434 F.2d 966 (C.A.1, 1970), *cert. denied,* 402 U.S. 973, 91 S.Ct. 1659, 29 L.Ed.2d 137 (1971); *U. S. v. Biancofiori,* 422 F.2d 584 (C.A.7), *cert. denied,* 398 U.S. 942, 90 S.Ct. 1857, 26 L.Ed.2d 277 (1970).

**22.** *See Hodgson v. Cleveland Municipal Court,* 326 F.Supp. 419 (N.D.Ohio, 1971); *Hodgson v. Hamilton Municipal Court,* 349 F.Supp. 1125 (S.D.Ohio, 1972). *Cf.* 14 A.L.R.Fed. 447.

constitutionality of a bankruptcy statute providing criminal sanctions for certain types of fraud, stated:

> [Congress] may embrace within its legislation whatever may be deemed important to a complete and effective bankrupt system . . . Any act, committed with a view of evading the legislation of Congress passed in the execution of any of its powers . . . may properly be made an offense against the United States.

*U. S. v. Fox,* 95 U.S. 670, 672, 24 L.Ed. 538, 540 (1878).[23] We conclude that Congress is authorized under the bankruptcy power and the necessary and proper clause to provide a civil remedy to people who are prevented from exercising rights granted under the bankruptcy statutes. With respect to the present case, § 1985(3) is just such a civil remedy, constitutionally applied under the facts.

Our conclusion that this application of § 1985(3) is constitutional draws strong support from *U. S. v. Waddell,* 112 U.S. 76, 5 S.Ct. 35, 28 L.Ed. 673 (1884). *Waddell* involved a criminal prosecution of a group of individuals who allegedly conspired to deprive a homesteader of "the right to establish his claim to certain lands of the United States under the homestead acts . . ." 112 U.S. at 77, 5 S.Ct. at 35, 28 L.Ed. at 673. The defendants were charged with violating the predecessor of 18 U.S.C. § 241[24] which imposes criminal penalties for conspiracies to interfere with any citizen's exercise of constitutional or statutory rights. The Supreme Court's analysis of the application of this criminal statute is particularly relevant since the civil and criminal sections of the civil rights statutes are construed *in pari materia.* See *Baldwin v. Morgan,* 251 F.2d 780, 789 (C.A.5, 1958); *Wiltsie v. California Dept. of Corrections,* 406 F.2d 515, 517 (C.A.9, 1968); *In re Estelle,* 516 F.2d 480, 486 (C.A.5, 1975) (separate opinion of Judge Tuttle) (and cases cited therein). In applying the criminal conspiracy statute to the conduct in question, the Court addressed itself to the source of congressional authority to prohibit, via § 241, conspiracies to interfere with the exercise of rights granted under the Homestead Acts:

> [Section 241's] object is to guaranty safety and protection to persons in the exercise of rights dependent on the laws of the United States, including . . . statutes . . ..
>
> The right assailed, obstructed and its exercise prevented or intended to be prevented . . . is very clearly a right wholly dependent upon the act of congress concerning the settlement and sale of the public lands of the United States. . . . The Constitution of the United States, by article

---

**23.** The statute in *Fox* provided criminal penalties for certain individuals who, within three months prior to entering bankruptcy proceedings, obtained goods on credit with intent to defraud. The Supreme Court held this was beyond Congress' power since "[t]he criminal intent essential to the commission of a public offense must exist when the act complained of is done; it cannot be imputed to a party from a subsequent independent transaction [i. e., the proceedings in bankruptcy]." 95 U.S. at 671, 24 L.Ed. at 539. The Court explicitly noted however that the bankruptcy power was broad and that such fraudulent transactions could be made criminal if done in contemplation of bankruptcy.

**24.** 18 U.S.C. § 241 provides:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

"If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

"They shall be fined not more than $10,000 or imprisoned not more than ten years, or both; and if death results, they shall be subject to imprisonment for any term of years or for life."

The defendants in *Waddell* were charged with violating Section 5508 of the Revised Statutes. This was merely an early version of present day § 241. The early version is substantially identical to § 241.

882

IV, Section 3, in express terms vests in Congress the power to dispose of and make all needful rules and regulations respecting the territory or other property of the United States.

. . . [B]ecause [the right obstructed] is a right asserted under the law of the United States and granted by that law, those acts come within the purview of the statute [§ 241] and of the constitutional power of Congress to make such a statute.

112 U.S. at 79–80, 5 S.Ct. at 36–37, 28 L.Ed. at 674. *Waddell's* analysis of the source of Congressional power to support the application of § 241 parallels our analysis of the source of Congressional power to support the application of § 1985(3). The Court in *Waddell* reasoned that the article IV, section 3 power in Congress "to dispose of and make Rules and Regulations respecting the . . . Property belonging to the United States" authorized the application of § 241 to a conspiracy to interfere with the exercise of rights granted under statutes enacted pursuant to that article IV, section 3 power. Similarly in the present case we hold that the article I, section 8 power to "establish uniform Laws on the Subject of Bankruptcies" authorizes the application of § 1985(3) to a conspiracy to interfere with the exercise of rights granted under statutes enacted pursuant to that article I, section 8 power.

## IV.

The decision of the District Court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

JOHN R. BROWN, Chief Judge (specially concurring):

I concur fully in the opinion and result. I add this concurrence to emphasize what *Griffin* did not decide and why, therefore, *Jacobson* does not, cannot rule as Fifth Circuit stare decisis.

*Griffin,* overruling the prior case law, held that some, but not all, private "tortious, conspiratorial interferences with the rights of others" violates § 1985(3). There was racial class-based animus in *Griffin.* The Court held this sufficient to bring the particular conspiracy within § 1985(3) and specifically pretermitted whether other types of "class-based invidiously discriminatory animus" will be sufficient.[1] Thus *Griffin* cannot stand for the proposition that only racial animus will trigger a § 1985(3) cause of action for private conspiracy, and the panel in *Jacobson v. Industrial Foundation of Permian Basin,* 456 F.2d 258 (C.A.5, 1972), in cryptically saying that "*Griffin* disposes of the issues here involved," could not have been establishing a rule for this circuit on the issue left open in *Griffin.* That question certainly was not "disposed of" by *Griffin.*[2]

As Judge Godbold points out, plaintiff Jacobson failed because there was no "class" (in the 1985(3) sense). He asserted the existence of no class other than to refer to the right of every Texas citizen to utilize the state Workmen's Compensation law and to refer to persons who under that law had filed claims similar

---

1. *See Griffin v. Breckenridge, supra* at 403 U.S. 102, 91 S.Ct. at 1798, 29 L.Ed.2d 348 n. 9.

2. In addition to the post-*Griffin* cases cited by Judge Godbold recognizing that non-racial animus suffices under § 1985(3), *see Glasson v. City of Louisville,* 518 F.2d 899 (C.A.6, 1975). The conspiracy was between police officers monitoring the proposed route of a motorcade in which then-President Nixon was to ride. Plaintiff's non-threatening sign, arguably expressing disagreement with presidential policies, was taken and torn up by police pursuant to instructions to seize and destroy all signs considered "detrimental" or "injurious" to the President, which in application meant any sign

not favorable to the President. The Sixth Circuit held there was a cause of action under § 1985(3). The class might well be defined as all persons along the proposed route carrying prohibited signs. The Sixth Circuit described the animus:

A more invidious classification than that between persons who support government officials and their policies and those who are critical of them is difficult to imagine. Appellees drew a line that was not merely invidious but one that also struck at the very heart of the protection afforded all persons by the First and Fourteenth Amendments. 518 F.2d at 912.

to his. This universe—and it is a pretty universal universe—was amorphous, undefined, and on its face far broader than persons having relationship to acts of the defendants, who were West Texas oil operators and a trade association in the Permian Basin of West Texas. The animus alleged was not against the class but only against plaintiff himself.

In contrast, McLellan's class is narrowly drawn and sharply defined—it consists of a substantial number of identifiable persons, employed by a single employer (from its title, presumably doing business in a single state), who are the victims of an admitted company policy that employees who filed petitions in bankruptcy will be discharged. The policy itself defines the class.

RONEY, Circuit Judge (concurring in part and dissenting in part):

I concur in sections I and II of the majority's opinion.

I respectfully dissent from the decision in section III that plaintiff has a 42 U.S. C.A. § 1985(3) cause of action against his employer and labor union for the termination of his employment because he filed for bankruptcy.

The decision runs contrary to precedent which this panel is bound to follow under our policy of not overruling prior decisions except en banc. *Jacobson v. Industrial Foundation of Permian Basin,* 456 F.2d 258 (5th Cir. 1972), denied a § 1985(3) cause of action when the defendants allegedly deprived plaintiff of employment by placing his name on a blacklist because he had filed workmen's compensation claims. The Court noted that he was not a member of a racial minority and that there was nothing in the record to support a contention that "he has filed a class action or that such a class exists." The Court relied on *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct.

1790, 29 L.Ed.2d 338 (1971), holding that "*Griffin* disposes of the issues here involved contrary to the contentions of Jacobson." 456 F.2d at 259. So it is here. The case before us and *Jacobson* are very similar. Both are without racial implications and there was no attempt in either case to allege a class protected by § 1985(3).

Although I have serious doubts about turning 42 U.S.C.A. § 1985(3) into a "general federal tort law," an interpretation clearly avoided by the Supreme Court in *Griffin v. Breckenridge, supra,* and in creating a federal cause of action against persons who give commercial effect to a filing in bankruptcy, I think the panel should not finally decide these matters now. These issues were neither briefed nor argued before the panel. Faithful adherence to *Jacobson* forecloses their consideration in this case except by the Court en banc.

## PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, WISDOM, GEWIN, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, MORGAN, CLARK, RONEY, GEE, and TJOFLAT, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.