GEMINI ENTERPRISES, INC. and Marion Hensley, Plaintiffs,

v.

WFMY TELEVISION CORPORATION, a subsidiary of Harte-Hanks Newspapers, Inc., CBS, Inc., and National Association of Broadcasters, Inc., Jointly and Severally, Defendants.

No. C-77-74-G.

United States District Court, M. D. North Carolina, Greensboro Division.

May 1, 1979.

William N. Martin, Greensboro, N. C., for plaintiffs.

Bynum M. Hunter and Harold N. Bynum, Greensboro, N. C., for WFMY Television Corp. and CBS, Inc.

James T. Williams and Edward C. Winslow, III, Greensboro, N. C., and Erwin G. Krasnow and Brenda L. Fox, Washington, D. C., for National Ass'n of Broadcasters, Inc.

## MEMORANDUM OPINION AND ORDER

GORDON, Chief Judge.

The complaint in this action alleges that the defendant WFMY Television Corporation (WFMY), CBS, Inc. (CBS), and the National Association of Broadcasters, Inc. (NAB) have engaged in a conspiracy to limit access to broadcast programming and advertising. The specific acts of which the plaintiffs complain are WFMY's refusal to sell plaintiff Gemini television time with which to advertise Gemini's astrological forecasting services and WFMY's refusal to permit plaintiff Marion Hensley, an astrologer, to appear on WFMY's local programming. The plaintiffs contend that these acts were in furtherance of the alleged conspiracy and violated 42 U.S.C. § 1985(3) by depriving the plaintiffs of the equal protection of the law and First Amendment rights to freedom of expression.[1]

The case is before the Court for consideration of defendant NAB's motion to dismiss for lack of personal jurisdiction and a Rule 12(b) motion made jointly by all defendants.

## BACKGROUND

Many of the material facts in this case are not in dispute. The NAB is a trade association of commercial radio and television broadcasters incorporated under the laws of the State of Delaware. NAB's principal place of business is located in Washington, D. C., with additional offices located in California and New York. Membership in NAB is voluntary. Both WFMY and CBS are members of NAB and are also subscribers to the Television Code.

The Television Code was promulgated by the Television Board of Directors of NAB and sets out a code of conduct for subscribers to follow in broadcast programming and advertising.[2] Two provisions of the Television Code are of particular interest in the present case. They state:

"IV. Special Program Standards

. . . . .

"12. Program material pertaining to fortune-telling, occultism, astrology, phrenology, palmreading, numerology, mindreading, character-reading, and the like is unacceptable if it encourages people to regard such fields as providing commonly accepted appraisals of life.

. . . . .

"IX. General Advertising Standards

. . . . .

"10. The advertising of fortune-telling, occultism, astrology, phrenology, palm-reading, numerology, mind-reading, character-reading or subjects of a like

---

1. Although the plaintiffs originally asserted various federal and state claims, all parties agreed at the oral argument of the motions to dismiss that the only claim the plaintiffs would assert in this suit would be one brought under 42 U.S.C. § 1985(3).

2. For a discussion of the development and structure of the Television Code, see Note, *The Limits of Broadcast Self-Regulation Under the First Amendment*, 27 Stanford L.Rev. 1527 (1975).

nature is not permitted." NAB, *The Television Code* (19th ed. 1976).

WFMY is a CBS affiliate located in Greensboro, North Carolina. WFMY has admitted that the plaintiff Marion Hensley appeared on its local programming from time to time in the years 1973 to 1976. WFMY further admits that after an appearance in November 1976, the station informed the plaintiff that she would not be invited again to appear on WFMY programming. WFMY further agrees that it has from time to time refused to sell advertising time to the plaintiff Gemini and it on at least one such occasion referred to the above quoted sections of the Television Code.

### NAB'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

■ NAB has moved to dismiss for lack of personal jurisdiction on the grounds that neither the applicable North Carolina statutory law nor the due process clause of the United States Constitution permits the exercise of jurisdiction by this Court. At the outset, the Court notes that the "minimal contacts" doctrine of *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), on which NAB relies, is not directly applicable to a federal question case brought in a federal district court when the defendant has been personally served within the United States. The *International Shoe* decision involved the *extraterritorial* assertion of personal jurisdiction by a *state* court. Where defendants reside within the territorial boundaries of the United States, the minimal contacts are present that are required to justify a federal court's exercise of power over them. *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972). The only situation in a federal suit that is directly analogous to the *International Shoe* case occurs where a federal court attempts to assert personal jurisdiction over a defendant not found within the territory of the United States. *See Gkiafis v. Steamship Yiosonas*, 342 F.2d 546 (4th Cir. 1965).

■ The doctrine of *International Shoe*, however, does have a role to play in the present case because of a curious anomaly that occurs in the jurisdiction of a federal court dealing with federal questions where there is no federal procedure available to bring out-of-state defendants into court without resort to the mechanics of state law. Rule 4(e) of the Federal Rules of Civil Procedure authorizes use of state process when there is no federal statute authorizing nationwide service of process or because the defendant has no agent within the state who can be served. In such cases, the validity of service made pursuant to state law is measured by the statutory and constitutional standards applied to judge service by state courts. *See Gkiafis v. Steamship Yiosonas*, 342 F.2d at 549–58; *see generally*, Foster, *Judicial Economy; Fairness and Convenience of Place of Trial: Long-Arm Jurisdiction in District Courts*, 47 F.R.D. 73 (1969). In the present case, NAB had no agent present in North Carolina to be served and no nationwide service of process is authorized for cases arising under § 1985, *Safeguard Mutual Insurance Co. v. Maxwell*, 53 F.R.D. 116 (E.D.Pa.1971). Service of process was effectuated in the District of Columbia as authorized by N.C.Gen.Stat. § 1A–1, Rule 4(j). This Court's jurisdiction over NAB is, therefore, to be judged by the standards which would apply if this suit had been brought in the state courts of North Carolina.

■ To resolve a question of personal jurisdiction under *International Shoe*, the Court must engage in a two step examination. First the Court must determine if the applicable North Carolina law would allow exercise of long-arm jurisdiction over NAB. If the answer to this inquiry is yes, the Court must then determine if the exercise of jurisdiction by a court sitting in North Carolina comports with due process. *Bowman v. Curt G. Joa, Inc.*, 361 F.2d 706 (4th Cir. 1966); *United Advertising Agency v. Robb*, 391 F.Supp. 626 (M.D.N.C.1975).

The Court's task in determining whether there is a North Carolina statute authorizing assertion of personal jurisdiction in the present case is simplified by the recent holding of the North Carolina Supreme Court in *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 231 S.E.2d 629 (1977). N.C.Gen.Stat. § 1–75.4(1)(d) provides for personal jurisdiction over all persons who are "engaged in substantial activity within this state." In *Dillon,* the N.C. Supreme Court read this subsection to apply to any defendant who meets the minimal contacts requirement of *International Shoe.* Accordingly, the question of whether there exists statutory authority for the exercise of personal jurisdiction over NAB collapses into the question of whether NAB has the minimal contacts with North Carolina necessary to meet the requirements of due process.

In urging this Court to find that NAB has insufficient contacts with North Carolina to permit the exercise of personal jurisdiction, NAB has built its legal argument on the many familiar decisions involving personal jurisdiction issues. The cases relied upon by NAB involve contract and personal injury disputes—the type of cases in which questions of personal jurisdiction usually arise. NAB contends that its most significant contacts with North Carolina rise from sporadic visits by a NAB regional manager for the purpose of membership solicitation. NAB further contends that such limited contacts will not support the exercise of personal jurisdiction over it. If this were a typical case, the plaintiffs' failure to substantiate additional contacts between NAB and North Carolina would be important since the plaintiffs have the burden of establishing sufficient facts to support personal jurisdiction.[3] The plaintiffs' failure, however, is immaterial because the undisputed facts in the record permit assertion of personal jurisdiction through reliance on what has been called the "conspiracy theory of personal jurisdiction."

■■■ The conspiracy theory of jurisdiction has evolved in connection with a number of cases alleging civil conspiracies. The theory seems to be based on the time honored notion that the acts of conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy. While a few courts have adopted a very restrictive or expansive view of the theory, most courts have worked out a middle ground on the conspiracy theory. *Compare I. S. Joseph Co., Inc. v. Mannesmann Pipe & Steel Corp.,* 408 F.Supp. 1023, 1024 (D.Miss.1976) and *National Van Lines, Inc. v. Atlas Van Lines, Inc.,* 406 F.Supp. 1087 (N.D.Ill.1975), *with Leasco Data Processing Equipment Corp. v. Maxwell, supra; Mandelkorn v. Patrick,* 359 F.Supp. 692 (D.D.C. 1973); *Socialist Workers Party v. Attorney General,* 375 F.Supp. 318 (S.D.N.Y.1974); *Ghazoul v. International Management Services, Inc.,* 398 F.Supp. 307 (S.D.N.Y.1975). While the cases are not entirely clear in explaining the theory, a fair statement of it would be that while the mere presence of a conspirator within the forum state is not sufficient to permit personal jurisdiction over co-conspirators, certain additional connections between the conspiracy and the forum state will support exercise of jurisdiction over co-conspirators. *See Leasco Data Processing Equipment Corp. v. Maxwell, supra; Mandelkorn v. Patrick, supra.* These additional connections exist where substantial acts in furtherance of the conspiracy were performed in the forum state and the co-conspirator knew or should have known that acts would be performed in the forum state. *See Leasco, supra; Brady v. Alderman,* 556 F.2d 571 (4th Cir. 1977) (unpublished); *Sparrow v. Goodman,* 376 F.Supp. 1268 (W.D.N.C.1974). The Court adopts this statement of the theory for purposes of deciding NAB's motion.

■■■ Although there is substantial agreement among the reported decisions

---

**3.** The plaintiffs did not accept the invitation of the Court to conduct discovery on the jurisdictional issue, and have not presented the Court with any evidence of NAB's contacts with North Carolina. The Court is, therefore, left in ignorance of the nature and frequency of what may be a source of significant contacts between NAB and North Carolina—NAB's contacts with its member radio and television stations in North Carolina.

over the substantive content of the conspiracy theory of jurisdiction, the decisions disagree on what showing a plaintiff must make to satisfy his burden in proving facts to justify the exercise of jurisdiction. Judge Blair in a thoughtful decision in *McLaughlin v. Copeland*, 435 F.Supp. 513, 529–33 (D.Md.1977), has reconciled much of the disagreement between the cases by examining the peculiar factual allegations and pleadings in each case. Distilled from the Court's opinion in *McLaughlin*, the rules governing the degree of proof necessary to establish personal jurisdiction in a conspiracy seem to be: First, where the defendant has not controverted with evidence the plaintiff's allegations, the determination of personal jurisdiction may be based on whether the plaintiff has pleaded the factual allegations essential for jurisdiction. Second, where the defendant has provided evidence which denies facts essential for assertion of jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant. These rules agree well with the rules which govern proof of personal jurisdiction in the usual case and will be adopted by the Court for use in the present case.[4]

Applying the above standards to the present case, the Court notes that this is a case in which the material facts are not in dispute. The plaintiff has alleged and the defendant NAB concedes that there was an agreement between NAB and WFMY that the television station as a member of NAB and a subscriber to the Television Code would act in conformance with the Code. NAB further concedes the accuracy of the plaintiffs' allegations that WFMY acted in compliance with their agreement when it refused to accept advertising from Gemini or to permit Marion Hensley to appear on its programming. Furthermore, it is undisputed that all acts of which the plaintiffs complain took place within North Carolina. Finally, NAB cannot deny that when WFMY subscribed to the Code, NAB expected WFMY to perform acts in North Carolina in accordance with the Code. The Court concludes that the undisputed facts in this case provide the basis for exercising personal jurisdiction over NAB using the conspiracy theory of jurisdiction.

## RULE 12(b) MOTION TO DISMISS

The defendants have jointly moved to dismiss the complaint for failure to state a claim upon which relief can be granted or, alternatively, for lack of subject matter jurisdiction on the ground that primary jurisdiction over this case lies in the Federal Communications Commission (FCC). The Court has considered the arguments and briefs of the parties and for the reasons set out below has concluded that the defendants' motion should be denied.

4. The plaintiff has the burden of alleging and proving the facts justifying the exercise of jurisdiction. *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). A litigant seeking federal court jurisdiction must plead the essential jurisdictional facts. In the general case, if the allegations supporting personal or subject matter jurisdiction are challenged by his adversary, the litigant has the burden of establishing such facts by the preponderance of the evidence. *Griffin v. Matthews*, 310 F.Supp. 341, 342 (M.D.N.C.1969), *aff'd* 423 F.2d 272 (4th Cir. 1970), *citing Gilbert v. David*, 235 U.S. 561, 35 S.Ct. 164, 59 L.Ed. 360 (1915).

A needed exception has grown up around the general rule to handle situations in which a decision on the jurisdictional dispute also embraces questions of ultimate liability. When the determination of the jurisdictional facts is intertwined with and may be dispositive of questions of ultimate liability, courts have held that the plaintiff need only show "threshold" or prima facie jurisdiction when the defendant challenges jurisdiction. *See McLaughlin v. Copeland, supra; Holfield v. Power Chemical Co., Inc.*, 382 F.Supp. 388, 390 (D.Md.1970); *cf. Schramm v. Oakes*, 352 F.2d 143, 149 (10th Cir. 1965). Where the long-arm statute is co-extensive with the limits of due process, such a prima facie showing may be made by showing jurisdictional facts which supply the minimal contacts required by due process. Using a standard which is akin to the one for summary judgment, the Court should grant the motion to dismiss if there is no genuine issue as to any material jurisdictional fact and the jurisdictional defect appears as a matter of law. This exception to the general rule applies to the conspiracy theory of jurisdiction when the defendant's ultimate liability may depend upon the existence of the alleged conspiracy.

In their motion to dismiss for failure to state a claim under § 1985(3), the defendants contend that the plaintiffs' claim is deficient in three respects. First, the defendants contend that the acts of which the plaintiffs complain do not violate § 1985(3) because there was no governmental involvement in WFMY's actions. Second, the defendants contend that the plaintiffs cannot recover because they did not have a right of access to WFMY's programming or advertising time. Third, the defendants assert the plaintiffs are not members of a class which § 1985(3) was intended to protect.

The seminal § 1985(3) case is the 1971 Supreme Court decision in *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).[5] At issue in *Griffin* was the question of whether the coverage of § 1985(3) reached a racially motivated private conspiracy to deprive black citizens of certain civil rights, including the First Amendment rights of freedom of speech, association and assembly. After examining the text of the statute, its companion provisions, and its legislative history, the Court found that all indicators "point unwaveringly to § 1985(3)'s coverage of private conspiracies." 403 U.S. at 101, 91 S.Ct. at 1798. The Court further found that it was not the Congressional intention that § 1985(3) inaugurate a general federal tort law but that it was to cover conspiracies motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus

. . . . The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." 403 U.S. at 102, 91 S.Ct. at 1798. Having determined that Congress had clearly intended § 1985(3) to reach racially motivated private conspiracies, the final step in the *Griffin* Court's analysis was to determine whether Congress had constitutional power to enact a statute that imposed liability under federal law for the alleged conspiracy. On the facts alleged in *Griffin*, the Court found the necessary Congressional power to be present in § 2 of the Thirteenth Amendment and in the Congressional power to protect the right of interstate travel.

In the years following *Griffin*, the extent of § 1985(3)'s reach has remained uncertain. Neither the Supreme Court nor the Court of Appeals for the Fourth Circuit has decided whether § 1985(3) covers conspiracies motivated by non-racial discriminatory intent, *Rodgers v. Tolson*, 582 F.2d 315, 317 (4th Cir. 1978), although at least two Courts of Appeals have so extended § 1985(3), see *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975). Similarly the Supreme Court has never resolved the question it explicitly reserved in *Griffin* of whether § 5 of the Fourteenth Amendment provides Congressional power with which to reach private conspiracies.

**5.** Section 1985(3) provides:

"If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the

United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

Like the present case, *Griffin* involved an alleged conspiracy formed for the purpose of depriving a person " 'of the equal protection of the laws or of equal privileges and immunities under the laws.' "

*The Requirement of Governmental Action*

■ While the Fourth Circuit has never decided whether § 1985(3) covers non-racially motivated conspiracies, it has clearly indicated that governmental involvement must be present in such conspiracies if they are to be reached by § 1985(3). In *Bellamy v. Mason's Stores, Inc. (Richmond)*, 508 F.2d 504 (4th Cir. 1974), the plaintiff sued his former employer under Title VII of the 1964 Civil Rights Act and § 1985(3) for reinstatement to his former job and damages. He claimed that his First Amendment rights were violated, alleging his discharge stemmed from his membership in the Ku Klux Klan. The Court characterized the issue on appeal as "whether a private employee is protected by federal law from discharge on the ground that he belongs to an obnoxious organization, *i. e.*, whether the right of association is protected against private interference." 508 F.2d at 505. Having found no grounds for an action under Title VII, the Court turned to the plaintiff's First Amendment (freedom of association) claim under § 1985(3). Noting that the language in the statute is identical to that found in the Fourteenth Amendment, the Court observed:

"[W]e think the language of equal protection chosen by the 1871 Congress cannot be interpreted to mean that persons who conspire without involvement of government to deny another person the right of free association are liable under this statute. This is so because the right of association derives from the first amendment—itself framed as a prohibition against the federal government and not against private persons, and because the incorporation doctrine has never been extended by the Supreme Court to apply to private persons.

". . . It is perfectly true that the first amendment now speaks to the states by way of the fourteenth amendment, but to say that it also speaks to private persons seems to us an innovation that must come from the Congress or the Supreme Court." 508 F.2d at 506–07.

Despite the Court's recognition that other circuits have reached the opposite conclusion on this important matter, the Court in *Doski v. M. Goldseker Co.*, 539 F.2d 1326 (4th Cir. 1976) reaffirmed the position it took in *Bellamy. See also Cohen v. Illinois Institute of Technology*, 524 F.2d 818, 828 (7th Cir. 1975) (requiring governmental action); *Action v. Gannon*, 450 F.2d 1227 (8th Cir. 1971) (en banc) (requiring no governmental action). Thus the rule in the Fourth Circuit seems to be that § 1985(3) does not cover non-racially motivated conspiracies to deprive persons of First Amendment rights unless the defendant's conduct constitutes governmental action.

Although broadcasting is subject to federal regulation, the mere fact one or more of these defendants is licensed by the government does not convert their action into governmental action. The Supreme Court has required in cases involving regulated businesses not only that there be a connection between the government and the business but that a close nexus exist between the government and the challenged *action* of the business. Where there is a sufficiently close nexus between the government and the challenged action, the action of the business may be treated as that of the government itself. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).

Most lower courts that have considered the question of whether broadcasters are instrumentalities of government for First Amendment purposes have concluded that they are not. *Kuczo v. Western Connecticut Broadcasting Co.*, 566 F.2d 384 (3d Cir. 1977). The Court is aware of only two cases in which it has been suggested that a broadcaster's actions could be treated as governmental action. The first was *Business Executives' Move for Vietnam Peace v. FCC*, 450 F.2d 642 (1971), *rev'd on other grounds sub nom. C.B.S., Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). In reversing the Court of Appeals decision, a majority of the Justices did not agree on the govern-

mental action issue and the case was decided on other grounds. The second case, *Writers Guild West, Inc. v. FCC*, 423 F.Supp. 1064 (C.D.Cal.1976), appeal docketed, Nos. 77–1058, 1059, 1060, 1061 and 1103 (9th Cir. March 15, 1977), also raised this issue. In that case the District Court held that, under the particular facts of the case, the broadcaster conduct therein challenged—adoption by the NAB and broadcasters of the so-called "family viewing" policy—constituted governmental action. The District Court expressly stated that while mere governmental encouragement of the policy would be insufficient to justify a finding of governmental action, the exertion of significant pressure by the FCC to adopt the policy infected the broadcasters' decision with governmental action. 423 F.Supp. at 1135–43.

While the approach taken by the District Court in *Writers Guild* is consistent with the Supreme Court's decisions in *Jackson* and *Moose Lodge*, it is unnecessary at the present time for this Court to decide the degree to which broadcaster action must be intertwined with government involvement in order to constitute governmental action. For on a motion to dismiss for failure to state a claim, district courts are admonished not to grant the motion "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir. 1969). The Court notes that plaintiffs' counsel at oral argument alluded to possible FCC involvement in the adoption of the challenged Television Code provisions. The Court also observes that at least one commentator has suggested that the FCC from time to time has played an active role in the adoption of various provisions of the Television Code. *See* Note, *The Limits of Broadcast Self-Regulation Under the First Amendment*, 27 Stanford L.Rev. 1527, 1150–53 (1975). Although, the Court doubts that the plaintiffs in the present case can establish the requisite government involvement in the adoption of the Television Code provisions, the proper motion with which to test the plaintiffs' evidence is one for summary judgment and not a motion to dismiss.

### First Amendment Right to Access to the Broadcast Medium

The defendants next contend that the plaintiffs have failed to state a claim because they have no First Amendment right of access to the broadcast medium for advertising or programming even if the broadcaster conduct is considered governmental action. The defendants correctly assert that broadcast licensees are free under the First Amendment and the Communications Act to refuse to sell advertising time to individuals or groups wishing to speak out on issues of public interest. *C.B.S., Inc. v. Democratic National Committee, supra*. Similarly, within the requirements of their duties as public trustees of the airwaves, broadcast licensees are free under the First Amendment to refuse to individuals or groups access to programming. *See, e. g., Massachusetts Universalist Convention v. Hildreth & Rogers Co.*, 183 F.2d 497 (1st Cir. 1950); *McIntire v. William Penn Broadcasting Co.*, 151 F.2d 597 (3d Cir. 1946). These principles are grounded in the fundamental protections provided by the First Amendment. Broadcasters together with the members of the print media are the gatekeepers who control much of the flow of information in our society. Within wide bounds, the First Amendment protects the ability of these gatekeepers to make decisions without government interference.

These principles, however, do not provide a rationale for granting the defendants' motion to dismiss in the present case. For the plaintiffs' contention that there was significant FCC involvement in the adoption of the Television Code provisions places this case fundamentally apart from those cases that uphold the rights of broadcasters to make independent decisions concerning the content of their programming and advertising. Assuming for purposes of this motion to dismiss that the defendants' actions constituted governmental action, the question for the Court becomes whether

these actions if taken by the government would have violated the plaintiffs' First Amendment rights or would have deprived the plaintiffs of the equal protection of the law.

Cast in this light this case presents a difficult question for which there is a dearth of authority in previously decided cases. The Court notes the Supreme Court's recent decision in *FCC v. Pacifica Foundation*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), which upheld the authority of the FCC to discipline a broadcaster for airing programming that included indecent speech. The Court observes that the operative facts in *Pacifica* are so different from those in the present case that the Supreme Court decision provides little guidance in the present case.[6] Of the decided cases, *Writers Guild* appears to be the case closest in point. The Court also notes that the Fourth Circuit in *Joyner v. Whiting*, 477 F.2d 456, 461–64 (4th Cir. 1973), discussed problems which arise when editorial decisionmaking becomes imbued with governmental action. The question presented in this case cannot now be decided for a constitutional question of this magnitude and uncertainty demands a degree of careful judicial scrutiny that is not possible given the present state of the record in this case. Consideration of the question must await further development of the facts at a later stage of this litigation.

### The Classes Protected by § 1985(3)

The defendants' third contention is that the plaintiffs have failed to state a claim because they are not members of a class that § 1985(3) was intended to protect. The question arises because the pertinent part of § 1985(3) requires that the proscribed conspiracy be "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immuni-

ties under the laws." In *Griffin*, the Supreme Court decided that the required purpose was present when racial animus existed but left open the question of whether the requirement could be met by some other class-based animus which was invidiously discriminatory. 403 U.S. at 102 n. 9, 91 S.Ct. 1790. The defendants assert that the coverage of § 1985(3) should be restricted to conspiracies for the purpose of discriminating against classes defined by sex, religion, national origin or some other class which would be considered a suspect category under the Fourteenth Amendment.

The Supreme Court's silence in *Griffin* concerning the extent of § 1985(3)'s coverage has created uncertainty in the lower courts about the matter. The Court of Appeals for the Fourth Circuit has declined on several occasions to decide whether § 1985(3) proscribes conspiracies that are motivated by invidiously discriminatory intent other than racial bias. See *Rodgers v. Tolson*, 582 F.2d at 317; *Doski v. M. Goldseker Co.*, 539 F.2d at 1333; *Hughes v. Ranger Fuel Corp.*, 467 F.2d 6 (4th Cir. 1972). Other Courts of Appeals, however, have extended § 1985(3) beyond actions that were animated by racial discrimination. See e. g., *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870 (5th Cir. 1976) (bankrupts); *Means v. Wilson*, 522 F.2d 833 (8th Cir. 1975) (supporters of a political candidate); *Cameron v. Brock*, 473 F.2d 608 (6th Cir. 1973).

In deciding what is the extent of § 1985(3)'s coverage, the Court should observe the Supreme Court's admonition in *Griffin* that in construing the Reconstruction Era civil rights statutes courts should " 'accord [them] a sweep as broad as [their] language.' " 403 U.S. at 97, 91 S.Ct. at 1796, citing *United States v. Price*, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966). The language of § 1985(3) is broad; it would extend coverage to "*any* person or

---

**6.** In the present case there are overtones of prior restraint, a much less easily justified governmental intrusion than the after the fact enforcement involved in *Pacifica*. The Court also observes that neither of the interests cited by the Supreme Court in *Pacifica* to justify limita-

tion on the content of speech is present here. This case does not involve entry into the home of patently offensive material nor does it involve indecent programming from which children should be protected.

class of persons [who have been deprived] of the equal protection of the laws, or of equal privileges and immunities under the laws." To accord § 1985(3) a sweep as broad as its language, the scope of § 1985(3)'s coverage must be at least co-extensive with the scope of the Equal Protection Clause of the Fourteenth Amendment since the language of § 1985(3) is drawn from the Equal Protection Clause.

■ As the Fifth Circuit pointed out in a case extending the coverage of § 1985(3) to individuals obtaining discharges in bankruptcies, the Fourteenth Amendment does not protect only those who are members of "suspect" groups:

> "It might be suggested that, since § 1985(3) alludes to 'equal protection,' the animus must consist in hostility toward one of the 'suspect classes' enjoying special protection under the Fourteenth Amendment. This view will not survive careful scrutiny. The *Griffin* case itself illustrates that the statute can be applied without any reliance on Fourteenth Amendment concepts. Moreover, blacks, aliens and other 'suspect' groups are by no means the only beneficiaries of equal protection under the Fourteenth Amendment. Any other group can rely on the equal protection clause to challenge state action that is not rationally related to a legitimate state goal. Since the Fourteenth Amendment is not directed exclusively at suspect groups, we decline to hold that it circumscribes the "classes" that might be targets of a conspiracy actionable under § 1985(3)." *McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870, 877–78 n. 15 (5th Cir. 1976) (citations omitted).

Accepting the Fifth Circuit's reasoning, the Court rejects the defendants' contention that the coverage of § 1985(3) extends only to members of a group that would be "suspect" class under the Fourteenth Amendment. Of course, as stated in *McLellan*, the group must be an identifiable one and the discriminatory animus must be "invidious," *i. e.*, irrational. *See* 526 F.2d at 875–79.

■ The defendants also contend that the plaintiffs are not members of an identifiable group and therefore cannot avail themselves of the protection of § 1985(3). Since the oral argument of this case, the Fourth Circuit has decided a case which concluded that in order to be a victim of class-based discrimination actionable under § 1985(3) a person must be a member of a larger group that could be objectively identified. *Rodgers v. Tolson*, 582 F.2d 315, 317–18 (4th Cir. 1978). In the present case, the plaintiffs allege the defendants' refusal to permit them access to programming and advertising time was made on the basis of the interest in astrology which the plaintiffs share with others. The Court notes that WFMY's actions toward the plaintiffs were allegedly taken pursuant to the two challenged Television Code provisions. Any contention that the plaintiffs are not members of an objectively identifiable group is allayed by the fact that WFMY easily discerned on at least one occasion that these plaintiffs were members of a group toward which a Code provision was directed. *Cf. McLellan v. Mississippi Power & Light Co.*, 526 F.2d 870; *Cameron v. Brock*, 473 F.2d 608.

## SUBJECT MATTER JURISDICTION

■ In their alternative motion to dismiss, the defendants invoke the doctrine of primary jurisdiction. That doctrine applies when a court and an administrative agency have concurrent jurisdiction over the determination of an issue. The classic summary of the doctrine of primary jurisdiction is contained in *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952);

> "[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and

consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

Thus the doctrine functions not to decide whether the court or agency will finally decide an issue but serves to delay the judicial decision until the court can take advantage of the administrative agency's expertise. The doctrine also promotes uniform decisionmaking in cases involving regulated industries. *Nader v. Allegheny Airlines*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

■■■ These dual policies which underlie the doctrine of primary jurisdiction provide the criteria with which to judge whether the doctrine should apply in a particular case. The factual issues encountered in the present case are almost entirely concerned with the existence of governmental action and the alleged conspiracy among the defendants. The FCC possesses no special expertise in such matters which could aid the Court in its resolution of the legal issues before it. Thus the referral of these issues to the FCC cannot be justified by the interest of informing the court's ultimate decision with "the expert and specialized knowledge," *United States v. Western Pacific R. Co.*, 352 U.S. 59, 64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), of the Commission. *Cf. Writers Guild of America, West, Inc. v. FCC*, 423 F.Supp. at 1090. Although the plaintiffs' claim is in effect a challenge to what is alleged to be a covert FCC policy to keep astrological programming and advertising off the air, the policy of promoting uniform decisionmaking does not provide a basis for referring this case to the FCC. Decisions which invoke the doctrine on this ground typically involve situation where the court's decision will be materially aided by the administrative clarification of an uncertain administrative rule or policy. *See e. g., Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Where the administrative rule or its application is clear there is no reason to postpone judicial action. The pertinent provisions of the Television Code and their application to these plaintiffs are clear and unambiguous. The FCC has little to add by way of clarification of these rules. It would also be inappropriate in the present case to invoke the doctrine of primary jurisdiction to commit consideration of this case to an agency which was allegedly the instigator of the challenged conspiracy. *Cf. Writers Guild of America, Inc. v. FCC*, 423 F.Supp. at 1090–91.[7]

---

7. In suggesting that the doctrine of primary jurisdiction requires that this case be submitted to the FCC for initial consideration, the defendants rely primarily on three cases: *Maguire v. Post Newsweek Stations, Capital Area, Inc.*, 24 P & F Radio Reg.2d 2094 (D.C.Cir.1972); *Morrisseau v. Mt. Mansfield Television, Inc.*, 380 F.Supp. 512 (D.Vt.1974); *The Polite Society, Inc. v. WLS, Inc.*, No. 74–Civ. 3777 (N.D.Ill. 1975) (unreported). *Maguire* is a very brief, unofficially reported decision of the District of Columbia Circuit which applied the doctrine of primary jurisdiction to the Fifth Amendment due process claims of plaintiffs who challenged excessively violent programming by broadcasters. The Court's brief order suggests that heavy reliance was placed on the fact that the FCC had established procedures to consider viewer complaints about programming and that there was an ongoing rulemaking proceeding on the subject of television violence. The defendants have not pointed out similar circumstances in the present case. In *Morrisseau*, the plaintiff complained of the FCC's refusal to order a broadcaster to provide the plaintiff with free advertising for his political campaign. In disposing of the case, the Court relied on the doctrine of exhaustion of administrative remedies, not the doctrine of primary jurisdiction. As for *The Polite Society*, the Court notes that the defendants have not provided the Court with a copy of the decision as required by Local Rule 18(d) of the Court of Appeals for the Fourth Circuit which governs citation of unpublished opinions in the district courts and the Court of Appeals. The defendants did provide a copy of the complaint in the *Polite Society* case as an attachment to their brief. The Court in *Writers Guild* described the *Polite Society* case as one based, like *Maguire*, on a complaint of excessively violent programming. 423 F.Supp. at 1091.

Even if the doctrine of primary jurisdiction applied to this case, the defendants' motion to dismiss should not be granted. The doctrine does not deprive the federal courts of subject matter jurisdiction to hear disputes but merely postpones the time for judicial consideration. K. C. Davis, Administrative Law of the Seventies, § 19.01 (1976). A stay of judicial action, rather than dismissal, is the usual result of the application of the doctrine. Dismissals rather than stays are approved only where .there is assurance that no party is prejudiced thereby. *United States v. Michigan National Corp.*, 419 U.S. 1, 5, 95 S.Ct. 10, 42 L.Ed.2d 1 (1974).

### ORDER

For the foregoing reasons, it is ORDERED that:

1. The defendant National Association of Broadcasters, Inc.'s motion to dismiss for lack of personal jurisdiction be, and the same hereby is, denied.

2. The defendants' joint motion to dismiss for failure to state a claim upon which relief can be granted or alternatively, for lack of subject matter jurisdiction, be, and the same hereby is, denied.