904 A.2d 786 (2006)
387 N.J. Super. 487
STATE of New Jersey, DEPARTMENT OF TREASURY, DIVISION OF INVESTMENT, by Treasurer John E. McCORMAC, Plaintiff-Respondent,
v.
QWEST COMMUNICATIONS INTERNATIONAL, INC., Joseph P. Nacchio, Stephen M. Jacobsen, Drake S. Tempest, Marc B. Weisberg, James A. Smith, Afshin Mohebbi, Lewis O. Wilks, Craig D. Slater and Arthur Andersen, LLP, Defendants, and
Robert S. Woodruff and Robin R. Szeliga, Defendants-Appellants.
State of New Jersey, Department of Treasury, Division of Investment, by Treasurer John E. McCormac, Plaintiff-Respondent,
v.
Qwest Communications International, Inc., Joseph P. Nacchio, Stephen M. Jacobsen, Drake S. Tempest, Marc B. Weisberg, James A. Smith, Afshin Mohebbi, Lewis O. Wilks, Craig D. Slater and Arthur Andersen, LLP, Defendants, and
Philip F. Anschutz, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 16, 2005.
Decided August 18, 2006.
*788 David Cook, argued the cause for appellant Robert S. Woodruff (McCarter & English, Newark; Mr. Cook, Wesley R. Powell (Clifford Chance US), of the New York bar, admitted pro hac vice, attorneys, New York City; Mr. Powell, of counsel; Joseph T. Boccassini, Newark, on the brief).
Thomas V. Reichert (Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg), of the California bar, admitted pro hac vice, Los Angeles, CA, argued the cause for appellant Robin R. Szeliga *789 (McCarter & English, Newark; Mr. Reichert, Mark T. Drooks (Bird, Marella, Boxer, Wolpert, Nessim, Drooks & Lincenberg), of the California bar, admitted pro hac vice, attorneys, Los Angeles, CA; Mr. Reichert and Mr. Drooks, of counsel; Joseph T. Boccassini, Newark, on the brief).
Michael J. Hoffman (Holme Roberts & Owen), of the Colorado bar, admitted pro hac vice, Denver, CO, argued the cause for appellant Philip F. Anschutz (McCarter & English, Newark; Mr. Hoffman, Bruce F. Black (Holme Roberts & Owen), of the Colorado bar, admitted pro hac vice, Denver, CO, and Neil M. Gorsuch (Kellogg, Huber, Hansen, Todd & Evans), of the District of Columbia bar, admitted pro hac vice, attorneys, Washington, DC; Mr. Hoffman, Mr. Black and Mr. Gorsuch, of counsel; Joseph T. Boccassini, Newark, on the brief).
Todd S. Collins (Berger & Montague) of the Pennsylvania bar, admitted pro hac vice, Philadelphia, PA, argued the cause for respondent (Sterns & Weinroth, Princeton and Mr. Collins, Merrill Davidoff and Ellen T. Noteware (Berger & Montague), of the Pennsylvania bar, admitted pro hac vice, attorneys, Philadelphia, PA; William J. Bigham, Nancy Axelrod, Mr. Davidoff and Ms. Noteware, of counsel; Mr. Bigham, on the brief).
Before Judges STERN, GRALL and LIHOTZ.
The opinion of the court was delivered by
GRALL, J.A.D.
This appeal arises from an action commenced by the State of New Jersey, Department of Treasury, Division of Investment (NJT) to recover damages allegedly sustained as a consequence of a civil conspiracy to induce investments in stock issued by Qwest Communications International, Inc. (Qwest) through a series of fraudulent misrepresentations. We granted three individual, non-resident defendants, Philip E. Anschutz, Robert S. Woodruff and Robin R. Szeliga (collectively defendants), leave to appeal from an order denying their motions to dismiss for want of personal jurisdiction.[1]
While defendants are not New Jersey residents and do not have continuous and systematic contacts with this State sufficient to permit an exercise of general jurisdiction, we conclude that NJT has established a "relationship among [each] defendant, the forum, and the litigation" that is sufficient to permit exercise of personal jurisdiction. Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323, 327, 558 A.2d 1252 (1989) (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683, 698 (1977)). The exercise of specific jurisdiction is based on defendants' "intentional act[s] calculated to create an actionable event in [this State],"  i.e., the intentional dissemination of false information "expected or intended to cause injury in New Jersey." Blakey v. Continental Airlines, Inc., 164 N.J. 38, 67, 751 A.2d 538 (2000).
The following facts relevant to specific jurisdiction are drawn from the pleadings and the evidential materials submitted on the motion to dismiss. See Blakey, supra, 164 N.J. at 71-73, 751 A.2d 538; Lebel, *790 supra, 115 N.J. at 324, 558 A.2d 1252. The judge took no testimony, and there are no findings based on credibility to which we owe deference. See Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). As defendants acknowledge, our review is de novo.
NJT alleged that between April 1, 1999 and December 3, 2001, it purchased seven million shares of common stock issued by Qwest at prices that were artificially inflated through a civil conspiracy to defraud investors by misrepresenting earnings and assets in public statements, press releases, SEC filings and conference calls with investors in which a representative of NJT participated. Qwest has since restated earnings for the relevant years and announced its intention to provide additional restatements.
NJT's complaint details the dates and contents of misleading statements and correlates those dates with the dates of large purchases of Qwest stock made by NJT. The complaint also recites transactions involving shares of stock in Qwest from which the individual defendants turned a profit and diminished the potential for loss of their personal wealth, through public sale or, in Anschutz's case, hedging transactions and a sale of the Anschutz Company's stock in Qwest to Bell South.
None of the individual defendants disputed signing the documents or making statements attributed to them in releases and filings. Nor do they dispute NJT's history of stock purchases or their individual acquisitions or sales of Qwest stock.
Anschutz became involved in Qwest before its stock was publicly traded. He owned 100% of the stock in the Anschutz Company. The Anschutz Company owned SP Telecom. SP purchased Qwest, and adopted its name. After that purchase, the Anschutz Company owned 100% of Qwest. Anschutz was a chairman of Qwest and a member of its executive committee at all relevant times.[2]
In fall 1996, when Qwest was considering a public offering of its stock, Anschutz met with Joseph P. Nacchio at Teterboro Airport in New Jersey. They discussed Nacchio's joining Qwest as its CEO. An agreement was reached under which Qwest opened offices in New Jersey and Nacchio worked from New Jersey, subject to the condition that he could be required to work in Colorado up to four days per week. Nacchio spent significant time in Colorado but also worked in New Jersey. Nacchio was in regular contact with Anschutz, whom he consulted on every major decision confronting him as CEO of Qwest. During Nacchio's tenure, Qwest traded its stock publicly. After the initial public offering, the Anschutz Company owned about 85% of the shares.
Woodruff was Qwest's CFO and Vice President of Finance when Nacchio took over as Qwest's CEO, and he stayed with Qwest until March 2001. Woodruff reported to Nacchio. He was responsible for treasury and finance. In addition, after Qwest went public, it added internal audit and investor relations divisions, both of which reported to the CFO. Woodruff had responsibility for SEC filings, which he signed after they were prepared by staff under his supervision. He involved outside auditors as he deemed appropriate. The investor relations division communicated with shareholders and the investment community; press releases and SEC filings were sent to investors who requested information. Woodruff reviewed *791 releases about earnings that were disseminated to the press and investors. A representative of NJT received that information in New Jersey. Information about holders of significant blocks of Qwest stock was available to him, "if [he] needed it." He denied knowing that NJT was a significant holder of Qwest stock.
In 1999 Qwest took steps in preparation for a merger with U.S. West and completed that merger in June 2000. A release sent to NJT and other investors by Qwest quoted Nacchio's expression of pleasure with Qwest's progress and Woodruff's characterization of the report as reflective of Qwest's "continued momentum" and "strong revenue growth." The release was sent to NJT in New Jersey in June 1999. In early July 1999, NJT acquired 150,000 shares of Qwest stock for $5.13 million. Qwest issued additional positive statements quoting Anschutz and Woodruff, and Woodruff signed additional filings in July and August of 1999. During those months, NJT purchased an additional 97,000 shares at a cost of $2.14 million. On October 27, 1999, Qwest announced record high quarterly revenues, in excess of one billion dollars in the most recent quarter. Releases and filings reporting dramatic increases continued through June 30, 2000, when U.S. West merged into and became part of Qwest. On July 3, 2000, NJT acquired 3,122,746 shares of Qwest stock for $161.6 million. On July 21, 2000, Nacchio sold 100,000 shares of his stock in Qwest.
Positive reports about Qwest's prospects were repeated in filings and releases after the merger. In December 2000 Qwest issued a press release to assure investors that it was not experiencing the difficulties its competitors were encountering and would meet expectations. In February 2001, Nacchio announced his confidence in Qwest's ability to meet its announced revenue goals. By that time NJT had purchased additional stock in Qwest well in excess of one million shares.
Qwest's earnings were overstated. This was accomplished through a scheme involving the sale and repurchase of capacity on its network ("IRUs" or "indefeasible rights of use") and the false reporting of those "swap" transactions. Expenses for equipment were also falsely stated. For example, as a consequence of a series of transactions with KMC Telecom Holdings (KMC), Qwest purchased equipment and sold that equipment to KMC. Qwest reported the sales as revenue; KMC financed the equipment and reported the debt. Qwest then paid KMC for use of the equipment. KMC is based in New Jersey. Woodruff acknowledged that he approved the restructuring of accounting concerning KMC receivables, but denied approving the original structuring. Earnings statements throughout the relevant period were based on similar reporting of similar transactions.
NJT alleges that Qwest's dealings with Tellium, which is another New Jersey based business, included an illegal "swap" transaction. Anschutz approved another agreement through which Qwest officers and employees obtained shares of stock in Tellium. NJT claims that there is a connection between these transactions.
Woodruff traveled to New Jersey less than a handful of times on business. He attended one meeting at Nacchio's New Jersey office at which the management team put together a budget for the upcoming year and another meeting that was held to prepare for the "earnings release process." Nacchio attended both meetings. Anschutz did not attend.
Woodruff also went to New Jersey on behalf of KPN Qwest, a joint venture between Qwest and a Dutch telephone company. KPN Qwest was issuing high-yield *792 debt, and the purpose of Woodruff's trip was to attract investors.
Woodruff left Qwest in March 2001, and Szeliga took over as acting CFO. She was named CFO on April 18, 2001. Prior to assuming Woodruff's responsibilities, Szeliga's duties included providing information to the investor relations group that reported to Woodruff. Szeliga saw "technical accounting opinions from [their] controllers group and from [their] auditors on how to account for [the KMC sales] and concurred with their reasoning and suggestions for the accounting for KMC." The investor relations division continued to provide releases, and notice of filings and investor-conference calls to NJT in New Jersey during Szeliga's tenure. Although purchases and sales of large blocks of stock by institutional investors were mentioned, to her, Szlega did not recall any mention of NJT. Like her predecessor, she signed SEC filings and approved releases that were transmitted to NJT.
On June 20, 2001, Morgan Stanley issued a report identifying suspected accounting irregularities in Qwest's financial statements. On the same day, Nacchio and Szeliga defended Qwest's reports and accounting methods on a conference call with investors. A representative of NJT participated in that call from New Jersey. Notice of that call was given to him by email received in New Jersey. On the same day Qwest also issued a press release confirming that it expected to meet its projections. On June 21, 2001, Szeliga reiterated Qwest's position in a statement filed with the SEC.
On July 25, 2001, Morgan Stanley issued a second report questioning Qwest's "swap" transactions. On August 21, 2001, Wolfe, head of the investor relations division, wrote to Nacchio and Szeliga and enclosed a list of institutional shareholders in descending order. The cover memo explained the pattern of investors' sales of Qwest stock between August 1 and 7, 2001. Wolfe noted that there were exceptions to the general patterns "depending on what they [the investors] believe about Qwest's story." On October 30, 2001, Qwest filed a registration statement with the SEC that incorporated earlier filings. It was signed by Nacchio, Szeliga and Anschutz.
On December 13, 2001, Qwest issued a release denying rumors about its improper recognition of the KMC transactions. That release quoted Szeliga. In late 2001 and early 2002, the Anschutz Company divested itself of a significant number of its shares in Qwest through hedging transactions and a sale to Bell South.
The foregoing evidence and reasonable inferences therefrom permit exercise of jurisdiction. New Jersey's long-arm rule permits courts to exercise personal jurisdiction to the fullest extent allowed under the United States Constitution. See R. 4:4-4(b)(1); Avdel Corp. v. Mecure, 58 N.J. 264, 268, 277 A.2d 207 (1971). While the basis for exercise of personal jurisdiction may be either general or specific, Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106, 119, 649 A.2d 379 (1994), cert. denied sub nom., WMX Tech., Inc. v. Canadian Gen. Ins. Co., 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995), there is no question that this case requires a basis for exercise of specific jurisdiction over the individual defendants, which is dependent upon the relationship of each with this State and this litigation. Lebel, supra, 115 N.J. at 323, 558 A.2d 1252; see Waste Mgmt., supra, 138 N.J. at 127, 649 A.2d 379. Our courts "evaluate the minimum contacts of a defendant [essential for specific jurisdiction] on a case-by-case basis." Blakey, supra, 164 N.J. at 66, 751 A.2d 538 (quoting Waste Mgmt., supra, 138 N.J. at 122, 649 A.2d 379). When the plaintiff establishes sufficient *793 minimum contacts, which is the first prong of a two-prong test, the burden shifts to the defendant to show that exercise of jurisdiction would offend "traditional notions of fair play and substantial justice," Lebel, supra, 115 N.J. at 327-29, 558 A.2d 1252, which is the second prong of the test. Defendants' argument on appeal is limited to the first prong of this test for specific jurisdiction.
Fraudulent communications are at the center of this controversy. NJT's claims are based on its assertion that it was injured as a consequence of intentionally false statements about the financial health of Qwest that were disseminated in this State and upon which NJT relied in investing public funds. The case is not about advertising a product that subsequently causes an injury that is unrelated to the communication. The crux of the cause of action is the dissemination of fraudulent statements into this State that caused harm to NJT here.
The New Jersey Supreme Court has addressed specific jurisdiction in cases centered on intentional torts based on wrongful communications on two occasions, and in both instances the Court has made it clear that an intentional communication of information with knowledge or purpose that it will cause harm in this State suffices to establish the requisite minimum contacts. Blakey, supra, 164 N.J. at 69, 751 A.2d 538 (discussing defamation); Lebel, supra, 115 N.J. at 326-27, 558 A.2d 1252 (discussing fraudulent statements).
In Lebel, the Court reasoned: "Where a defendant knowingly sends into a state a false statement, intending that it should then be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state." Id. at 326, 558 A.2d 1252 (quoting Vishay Intertechnology, Inc. v. Delta Int'l Corp., 696 F.2d 1062, 1066 (4th Cir.1982)). The Court held that New Jersey had specific jurisdiction in a case involving fraud in the sale of a boat to a New Jersey resident by a Florida company. Id. at 320-21, 324-26, 558 A.2d 1252. With respect to communications, the Court made it clear that it is not the fact or frequency of the communication but its relationship to the cause of action that is relevant. Id. at 325-26, 558 A.2d 1252 (noting that the "nature of the contact" rather than the transmittal of the message was critical and stressing "that in this case it is alleged that the defendant's representations via mail and telephone to New Jersey were fraudulent"). As in Lebel, the fact that this litigation is centered upon fraudulent communications is critical in the analysis of the significance of the dissemination of the information to NJT in this State.
Similarly, in Blakey the Court held that the question of specific jurisdiction over individual defendants alleged to have made defamatory and retaliatory statements was whether that harassment was expected or intended to cause injury in New Jersey. 164 N.J. at 68, 751 A.2d 538. In this case, as in Blakey, the gravamen of the conduct alleged is the communication disseminated to NJT in this State. The Court further explained that where actionable harm is caused in this State, "`[t]he fact that the actions causing the effects in [New Jersey] were performed outside the State did not prevent the State from asserting jurisdiction over a cause of action arising from those effects.'" 164 N.J. at 67-68, 751 A.2d 538 (quoting Calder v. Jones, 465 U.S. 783, 787, 104 S.Ct. 1482, 1485, 79 L.Ed.2d 804, 810 (1984)). The Court concluded that where actionable communications are at issue, the question is "whether the [communication] was expected or intended to cause injury in New Jersey"  i.e., whether the statements were issued "with knowledge or purpose of causing *794 harm to plaintiff [in this State]." Id. at 67, 751 A.2d 538.
Neither Lebel nor Blakey establish a new rule of law governing specific jurisdiction in cases involving tortious communications. Both cases rely upon decisions of the United States Supreme Court involving actions for libel. Blakey, supra, 164 N.J. at 67, 751 A.2d 538; Lebel, supra, 115 N.J. at 323, 558 A.2d 1252. In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 775, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790, 798 (1984), the Court held that regular circulation of a magazine in the forum state was sufficient to establish personal jurisdiction in a libel case. In Calder, supra, 465 U.S. at 789, 104 S.Ct. at 1486, 79 L.Ed.2d at 811-12, the Court held alleged intentional, libelous conduct in Florida "expressly aimed at California" was sufficient to permit California's exercise of jurisdiction. In Waste Mgmt., supra, 138 N.J. at 126, 649 A.2d 379, the New Jersey Supreme Court explained the rule established in Calder: "An intentional act calculated to create an actionable event in a forum state will give that state jurisdiction over the actor." We read Blakey and Lebel to hold that action with the knowledge or intention of causing harm within this State satisfies the role of the "`purposeful availment' requirement [of minimum contacts jurisprudence, because it] ensures that a defendant will not be haled into a jurisdiction solely as a result of `random,' `fortuitous,' or `attenuated' contacts." Blakey, supra, 164 N.J. at 67, 751 A.2d 538 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528, 542 (1985)); see also IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 260 (3d Cir.1998) (noting that an intentional tort "may suffice to enhance otherwise insufficient contacts with the forum").
Defendants correctly note that the actions and knowledge of each of them must be considered individually not in the aggregate. Waste Mgmt., supra, 138 N.J. at 127, 649 A.2d 379. Woodruff, Szeliga and Anschutz all signed filings with the SEC that included allegedly false statements that induced NJT to purchase and hold Qwest stock. NJT received in New Jersey specific notice of those filings and accompanying press releases from Qwest's investor relations division that included statements from all three defendants. The approval of such statements and the system for their dissemination by the investor relations division is sufficient to give rise to an inference that each of these defendants recognized that investors would rely upon them. See Derensis v. Coopers & Lybrand Chartered Accountants, 930 F.Supp. 1003, 1014 (D.N.J. 1996) (discussing jurisdiction in New Jersey over officers of a Canadian company and apparently relying on status as a "controlling person" under 15 U.S.C.A. § 78t(a)); cf. City of Monroe Employees Ret. Sys. v. Bridgestone Corp., 399 F.3d 651 (6th Cir.) (dismissing claim against foreign national on grounds of reasonableness under the circumstances and declining to exercise jurisdiction based on status of "controlling person" under those circumstances), cert. denied, ___ U.S. ___, 126 S.Ct. 423, 163 L.Ed.2d 322 (2005). The dissemination to NJT, an institutional investor of public funds, was accomplished through a division of Qwest established for the very purpose of addressing questions and concerns of investors. There is a basis for an inference that Anschutz, Woodruff and Szeliga were aware of this system for dissemination and expected it to have an impact on the recipient-investors who were the targets, wherever they might be located.
With respect to Woodruff and Szeliga, there are additional bases for concluding *795 that they were specifically aware that NJT was a major investor and would suffer particular harm. They oversaw the functions of the division of investor relations as well as the preparation of the financial information included in the various statements and releases. The investor relations division maintained lists of large investors. NJT appeared on that list; at one relevant point NJT was ranked among the top thirty-five institutional investors. A copy of that list was sent to Szeliga, and Woodruff acknowledged that he had access to information about top investors if he needed it. NJT received in New Jersey email notices and releases, including information filed with the SEC.
The communications with NJT as an investor were not fortuitous or wholly dependent upon NJT's actions, and the communications were the actions that NJT alleges caused harm. Defendants' argument that these communications were dependent upon NJT's action in requesting to receive information sent to investors overlooks the role of the Qwest investor relations division and the relevance of these statements to the harm alleged.
Defendants' reliance upon Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assoc., 142 F.3d 26 (1st Cir.1998), is misplaced. In that case, plaintiff attempted to base jurisdiction on isolated communications peripheral to the conspiracy alleged, not on a fraudulent communication that was the wrong alleged. This case is more analogous to Cody v. Ward, 954 F.Supp. 43, 45-47 (D.Conn. 1997), in which the court held that oral misrepresentations directed specifically to the forum for the purpose of causing the recipient to purchase shares of stock were sufficient to permit exercise of specific jurisdiction in an action based on the fraud.
Defendants seem to argue that because other investors in other states also received the fraudulent information, the notices directed to NJT cannot be viewed as aimed at an investor in this State. We do not see how that diminishes the significance of the fact that the false statements were directed to NJT, a recipient-investor in this State. The question is whether this State was the focal point of a harm NJT suffered as a consequence of the intentional tort aimed at NJT in this State. IMO Indus., supra, 155 F.3d at 261, 265-66 (finding no basis for specific jurisdiction in state of plaintiff's principal place of business where tortious conduct was not directed at the plaintiff in that forum). There is no authority for the proposition that jurisdiction grounded on such conduct is defeated because there may be another, similarly situated and targeted victim in a different forum.
With respect to defendants' individual protestations of ignorance about transmissions to NJT, other courts have recognized that a "`conspiracy theory' of personal jurisdiction is based on the `time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy.'" Textor v. Bd. of Regents, 711 F.2d 1387, 1392-93 (7th Cir.1983) (quoting Gemini Enter., Inc. v. WFMY Television Corp., 470 F.Supp. 559, 564 (M.D.N.C.1979)); see Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 102 n. 8 (3d Cir.2004) (Scirica, J., dissenting) (discussing imputation of jurisdictional contacts based upon conspiracy theory). In Matsumoto v. Matsumoto, 335 N.J.Super. 174, 180-85, 762 A.2d 224 (App.Div.), aff'd and modified on other grounds, 171 N.J. 110, 792 A.2d 1222 (2002), we upheld the trial judge's conclusion that New Jersey had personal jurisdiction over a foreign national who interfered with the custody of a parent in this State. In so doing, we relied, in part, upon Chiosie v. Chiosie, 104 *796 A.D.2d 962, 480 N.Y.S.2d 756, 757 (N.Y.App.Div.1984). In that case the court held that tortious acts of co-conspirators in New York were sufficient to establish jurisdiction over a co-conspirator defendant who was a resident of New Jersey. Ibid.
In this case, the investor relations division was established under the supervision of Woodruff, Nacchio and, inferentially, Anschutz, and the division was given financial information by and then taken over by Szeliga. Each of the defendants made or signed statements disseminated to NJT through the investor relations division. An inference and imputation of knowledge that the investor relations division would transmit the false statements to investors who requested regular notification is available on these facts.
In addition to the dissemination of the fraudulent reports in this State, NJT alleges other overt acts in New Jersey in furtherance of the conspiracy that are directly related to and facilitated the production of the fraudulent statements. The structuring and reporting of equipment sales to KMC Telecom Holdings, a New Jersey based company, is one of the allegedly misstated transactions. Woodruff came to New Jersey in connection with the joint venture, KPN Qwest. NJT alleges that Qwest overstated the worth of that joint venture. There is also evidence that Anschutz was involved in Qwest's dealings with Tellium, which NJT alleges included an illegal "swap" transaction that was not properly reported. These transactions, which were allegedly misrepresented in financial reports, were actions in this jurisdiction in furtherance of the conspiracy to defraud investors.
Under all of the circumstances, we cannot conclude that NJT failed to present evidence and reasonable inferences adequate to raise a factual issue on whether each of the individual defendants contributed to the dissemination of false information to NJT with the intention or expectation of causing harm to NJT as a recipient investor. We note that defendants have not presented an argument that addresses NJT's pleadings and proofs with respect to the individual counts of the complaint  i.e., defendants' argument does not distinguish NJT's claims based on intentional fraud and civil conspiracy from claims based on negligence in reporting. For that reason we neither consider the issue nor foreclose reconsideration of jurisdiction on a claim-by-claim basis in the trial court.
As noted above, defendants present no argument on this appeal in connection with the "second prong" of the test for specific jurisdiction  "whether it would offend traditional notions of fair play and substantial justice to entertain the suit." Lebel, supra, 115 N.J. at 327, 558 A.2d 1252. In order to obtain a dismissal on that basis, defendants must establish a "compelling case that the presence of some other considerations would render jurisdiction [based on their respective roles in dissemination of false information to NJT in this State] unreasonable." Id. at 328, 558 A.2d 1252 (quoting Burger King, supra, 471 U.S. at 477, 105 S.Ct. at 2184, 85 L.Ed.2d at 544, and identifying factors such as the burden on the defendant, the plaintiff's interest in obtaining relief, the interest of the forum state and the interstate judicial system's interest in efficient resolution of controversies).
We see no basis for finding offense to traditional notions of substantial justice and fairness by entertaining this action to recoup significant public funds lost as a consequence of reliance on the alleged false statements transmitted to NJT in this State. In this connection, Nacchio's presence in New Jersey as CEO of Qwest cannot be overlooked. Nacchio *797 was at the center of the conspiracy to misstate earnings; NJT's complaint contains numerous relevant statements attributed to him. He had offices in New Jersey from which he worked on a regular, albeit part-time, basis, and he had ongoing contacts with his subordinates Szeliga and Woodruff and his superior Anschutz. Woodruff attended a meeting with Nacchio in New Jersey, the topic of which was the release of earnings information at issue. The significant amount of NJT's investment and loss is also relevant to defendants' expectations about being haled into the courts of this State and the State's interest in providing a forum. Lebel, supra, 115 N.J. at 330, 558 A.2d 1252 (discussing the relevance of the amount in controversy to the second-prong of the test for exercise of personal jurisdiction).
Defendants' argument on this appeal focuses on the trial judge's reliance on the stream of commerce theory of personal jurisdiction adopted by the Supreme Court in Charles Gendler & Co. v. Telecom Equip., Corp., 102 N.J. 460, 508 A.2d 1127 (1986). We do not read the trial judge's decision as fully dependent upon Gendler, and, in any event, our determination of the legal questions is de novo, as defendants recognize.
The order is affirmed and the matter is remanded. We do not foreclose reconsideration of the question of personal jurisdiction over the individual defendants as the discovery on the individual claims proceeds. See Blakey, supra, 164 N.J. at 60, 71-73, 751 A.2d 538.
NOTES
[1] By order dated January 26, 2005, we consolidated the appeal filed by Szeliga and Woodruff (A-2505-04) with the appeal filed by Anschutz (A-2511-04) and with an appeal filed by NJT from a separate interlocutory order granting a motion to dismiss filed by defendant Arthur Andersen, LLP (A-2503-04). We now de-consolidate NJT's appeal (A-2503-04), which we address in a separate decision. State of New Jersey v. Qwest Comm. Int'l, Inc., 387 N.J.Super. 469, 904 A.2d 775 (App.Div.2006).
[2] The record is less than clear on the proper title of Anschutz's businesses  Anschutz Corporation or Anschutz Company and SP Construction or SP Telecom  but there is no dispute about the ownership or relevant transaction.